**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| **ALLENTOWN AMBASSADORS, INC.,** | : | |
| | : | Bky. No. 04-22368ELF |
| Debtor | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |
| **ALLENTOWN AMBASSADORS, INC.** | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **NORTHEAST AMERICAN BASEBALL, LLC,** | : | |
| et al. | : | |
| | : | |
| Defendants | : | Adv. No. 04-2390 |
| | : | |

# O P I N I O N

**BY**: **ERIC L. FRANK, United States Bankruptcy Judge**

1

## TABLE OF CONTENTS

I.    INTRODUCTION

II.   SUMMARY JUDGMENT STANDARDS

III.  FACTS

IV.   PROCEDURAL HISTORY

V.    COUNT I  -  VIOLATION OF THE AUTOMATIC STAY  - 11 U.S.C. §362(a)(3)

    A.   Contentions of the Parties

        1.   The Debtor's Position

        2.   The Defendants Position

    B.   Section 362(a)(3) May Stay Acts to Possess or Control Intangible Property Rights of the Bankruptcy Estate, Depending Upon (1) the Nexus Between the Conduct at Issue and the Property Interests of the Estate, (2) the Degree of Impact on the Bankruptcy Estate and (3) the Nature of Any Competing Legal Interests

    C.   The Defendants Are Not Entitled to Summary Judgment on the Debtor's Claim that Their Conduct Constituted the Exercise of Control Over the Debtor's Intangible Property Rights in Violation of 11 U.S.C. §362(a)(3)

        1.   Prior to Commencement of the Bankruptcy Case, the Debtor Had Intangible Membership Rights in the NAB, LLC, Including Certain Management Rights Purportedly Terminated Upon the Debtor's Bankruptcy Filing Pursuant to the *Ipso Facto* Provision of the NAB, LLC Operating Agreement

        2.   To Evaluate the Enforceability of  the *Ipso Facto* Provision of the NAB, LLC Operating Agreement, It Is Necessary to Determine Whether the Operating Agreement Is an Executory Contract

        3.   The NAB, LLC Operating Agreement Is an Executory Contract

        4.   The Present Record Does Not Permit A Finding that the *Ipso Facto* Provision of the Operating Agreement Is Enforceable Under 11 U.S.C. §365(e)(2)

            a.   In Applying 11 U.S.C. §365(e), the Court Must Also Consider 11 U.S.C. §365(c) and (f)

            b.   Section 365(e)(1) Overrides a Contractual *Ipso Facto* Provision Unless (1) An Applicable Statute or the Common Law Unequivocally Prohibits an Assignment of the Contract Without the Non-Debtor's Consent or (2) the Identity of the Assignee Would Be Material to the Non-Debtor, Taking into Consideration the Nature of the Enterprise in Which the Debtor and the Non-Debtor Are Engaged

            c.   The North Carolina Limited Liability Company Act Is Not  "Applicable Law" that Unequivocally Prohibits an Assignment of the Contract Without the Non-Debtor's Consent and the Present Record Does Not Support a Finding that the Identity of an Assignee of the Debtor's Membership Interest Would Be Material to the Other LLC Members

        5.   The Present Record Does Not Establish that the Bankruptcy Estate's Property Interests Were So Insubstantial or the Justification for the Defendant's Actions Dissolving the LLC to the Detriment of the Estate as to Warrant Entry of Summary Judgment Against the Debtor on Its §362(a)(3) Claim

VI. COUNT II - BREACH OF FIDUCIARY DUTY

VII.  CONCLUSION

# I. <u>INTRODUCTION</u>

This adversary proceeding arises in the chapter 11 bankruptcy case of a corporation that previously operated a minor league baseball team.  The plaintiff is the Allentown Ambassadors, Inc. ("the Debtor").  Presently, the remaining defendants in the proceeding are the teams which were members of the now dissolved baseball league ("the Team Members"), the league's Commissioner, Miles Wolff  ("Defendant Wolff"), and the league itself.   The league was in the business form of a limited liability company ("LLC") and was called the North American Baseball, LLC ("the NAB, LLC").

The Debtor's primary claim is that the Team Members "exercise[d] control over property of the estate" in violation of 11 U.S.C. §362(a)(3) when they dissolved the NAB, LLC and formed a new baseball league without including the Debtor, approximately six (6) months after the commencement of this bankruptcy case.  The Debtor's other claim is that Defendant Wolff breached his fiduciary duty to the Debtor in his actions as a manager of the NAB, LLC.

The Defendants have filed a Motion to Dismiss the Debtor's Second Amended Complaint ("the Motion").  This is the fourth motion to dismiss filed by the Defendants since the initiation of this adversary proceeding on September 20, 2004.

In this latest Motion, the parties have supplemented the record with excerpts from a transcript of a hearing conducted in the main bankruptcy case, a deposition transcript, an affidavit from a party and certain documents.[1]   Pursuant to Fed. R. Civ. P. 12(b)(6), I will treat the

---

[1]  In addition, I have reviewed one of the motions filed by NAB, LLC in the main bankruptcy case and the Debtor's response thereto.  I may take judicial notice of the content of the documents filed in the case for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute.  <u>See</u> Fed. R. Evid. 201;  <u>In re Scholl</u>, 1998 WL 546607, at *1 n. 1 (Bankr. E.D. Pa. Aug. 26, 1998).  <u>See also</u> <u>In re Indian Palm Associates, Ltd.</u>,

Motion as a motion for summary judgment under the Fed. R. Civ. P. 56.[2]

To decide the Motion, I must engage in an elaborate analysis of the interrelationship of several provisions of the Bankruptcy Code and applicable state law.  Among the provisions I must consider are 11 U.S.C. §§362(a)(3), 365(c), 365(e), 365(f) and the North Carolina Limited Liability Company Act, N.C.G.S.A. §§ 57C-1-01 et seq. ("the NCLLCA").

As explained below, I conclude that:

1. The present record is inadequate to permit a determination whether the provision of the NAB, LLC Operating Agreement which purported to terminate the Debtor's status as a member of the LLC upon its bankruptcy filing is enforceable under 11 U.S.C. §365(e).

2. Because the record does not permit a determination that the Debtor's membership in the NAB, LLC terminated upon its bankruptcy filing and the Defendants do not dispute that the Debtor retained its "economic rights" in the NAB, LLC after its bankruptcy filing, the Defendants are not entitled to summary judgment on the Debtor's claim that the Defendants violated 11 U.S.C. §362(a)(3).[3]

---

61 F.3d 197, 205 (3d Cir. 1995).

[2] Fed. R. Civ. P. 12 is applicable in this adversary proceeding by virtue of Fed. R. Bankr. P. 7012.  Fed. R. Civ. P. 12(b)(6) provides, in pertinent part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

[3] In the Second Amended Complaint, the Debtor seeks redress under 11 U.S.C. §362(h) for the asserted violation of §362(a)(3).  Section 362(h) was recodified at §362(k) as a result of the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005).  This bankruptcy case and adversary proceeding were filed prior to BAPCPA's enactment. Therefore, in the Opinion, I will employ the old codification, §362(h).

3.  Defendant Wolff owed a fiduciary duty to individual members of the NAB,
LLC, such as the Debtor and therefore, the Defendants are not entitled to
summary judgment on Count II of the Second Amended Complaint.

Based on these conclusions, I will deny the Motion in its entirety.

## II. SUMMARY JUDGMENT STANDARDS

The standards for evaluating a motion for summary judgment under Fed. R. Civ. P. 56[4]

are well established and have been stated in numerous written opinions in this district.  E.g., In re

Klayman, 333 B.R. 695 (Bankr. E.D. Pa. 2005); In re LaCheen, 2005 WL 1155257 (Bankr. E.D.

Pa. April 28, 2005) (Sigmund, Ch. J.); In re Lewis, 290 B.R. 541 (Bankr. E.D. Pa. 2003) (per

Carey, J.); In re Newman, 304 B.R. 188 (Bankr. E.D. Pa. 2002) (per Fox, Ch. J.).

Pursuant to Rule 56, summary judgment should be granted when the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  Before a motion for summary judgment may be

granted, the court must find that the motion alleges facts which, if proven at trial, would require a

directed verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115

(11th Cir. 1993).  If the movant meets this initial burden, the responding party may not rest on his

pleadings, but must designate specific factual averments through the use of affidavits or other

permissible evidentiary material that demonstrate a triable factual dispute.[5]  Celotex Corp. v.

---

[4]  In addition to its incorporation through Fed. R. Bankr. P. 7012 and Fed. R. Civ. P. 12,
Rule 56 is made applicable in this adversary proceeding by Fed. R. Bankr. P. 7056.

[5]  The respective burdens of proof of the parties also play a role in determining the
merits of a summary judgment motion:

5

Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986); Anderson v. Liberty Lobby, Inc., 477

U.S. at 247-50, 106 S.Ct. at 2510-11.  Such evidence must be sufficient to support a jury's factual

determination in favor of the nonmoving party.  Id.  Evidence that merely raises some

metaphysical doubt regarding the validity of a material facts is insufficient.  Matsushita Electric

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).  If the

party opposing the motion believes that summary judgment is premature, Rule 56(f) requires the

party to present by affidavit the reasons why the party is presently unable to submit evidence in

opposition to the motion.  Celotex, 477 U.S. at 326, 106 S.Ct. at 2554.

In its consideration of the evidence submitted in support of and opposition to a

motion for summary judgment, the court's role is not to weigh the evidence but only to determine

whether there is a disputed, material fact for determination at trial.  Anderson v. Liberty Lobby,

Inc., 477 U.S. at 247-50, 106 S.Ct. at 2510-11 (1986).  All reasonable inferences must be drawn

in favor of the nonmoving party and against the movant.  United States v. 717 South Woodward

Street, 2 F.3d 529, 533 (3d Cir.1993).

With these criteria in mind, I will wade into the pleadings and evidentiary material which

───────────────

> [W]here the movant is the defendant, or the party without the burden of proof on
> the underlying claim, the movant still has the initial burden of showing the court
> the absence of a genuine issue of material fact, but . . . this does not require the
> movant to support the motion with affidavits or other materials that [negate] the
> opponent's claim. In contrast, where . . .  "the party moving for summary judgment
> is the plaintiff, or the party who bears the burden of proof at trial, the standard is
> more stringent."  National State Bank v. Federal Reserve Bank, 979 F.2d 1579,
> 1582 (3d Cir.1992).

In re Newman, 304 B.R. at 193 (quoting  Adams v. Consolidated Rail Corp., 1994 WL 383633,
*1-*2  (E.D. Pa. 1994)).

6

the parties have submitted in support of their positions.

## III.  FACTS

I will first summarize the factual background of the dispute between the parties because it

will be helpful in understanding the procedural history of this adversary proceeding and the

present posture of the parties' dispute.  In order to set forth a coherent and essentially

chronological summary, I rely upon the allegations of the Debtor's Second Amended Complaint,

the deposition of Defendant Wolff (taken on February 6, 2006) ("Wolff Deposition"), the

affidavit of Defendant Wolff ("Wolff Affidavit") submitted by the Defendants in support of the

pending Motion and certain pleadings filed by the parties in the chapter 11 case to which this

adversary proceeding is related.

The Northeast League ("the Old NE League") was  an independent, minor baseball

league.  It was founded in 1995 with six (6) teams.  In 1996, the Debtor purchased a franchise in

the Old NE League.  By 1997, the Old NE League had expanded to eight teams, including the

Debtor's team (the Allentown Ambassadors).  Debtor's Second Amended Complaint ¶¶5-6;

Affidavit of Miles Wolff ¶6-7 ("Wolf Affidavit").

In 1999, the Old NE League merged with the Northern League, an older and more

established independent minor league.[6]   Following the merger, the newly-merged league was

called "the Northern League" ("the Combined League").  The eight teams of the Old NE League,

including the Debtor's team (the Ambassadors), became the East Division of the Combined

League.   Following the merger, Defendant Wolff was chosen to be the Commissioner of the

---

[6] Defendant Wolff was an owner of one of the Northern League teams.

Combined League.  Debtor's Second Amended Complaint ¶¶8-9; Wolf Affidavit ¶¶8-9.

During Defendant Wolff's tenure as Commissioner of the Combined League, the Debtor

alleges that five (5) events occurred that are material to its claims in this litigation:

1.  The Combined League owners "stipulated" that, prospectively, the value of a
    league franchise would be $750,000.

2.  The Combined League surcharged its members some unstated amount of
    money to assist one of its members, the Albany Diamond Dogs, which was
    allegedly experiencing financial difficulties.[7]

3.  Another team experiencing financial difficulties, the Massachusetts Mad Dogs
    were permitted to "go dark"[8] for two seasons and retain its franchise in the
    Combined League by paying only its "annual dues."

4.  Still another team experiencing financial difficulties, the Adirondack
    Lumberjacks, was permitted to "go dark" for a season without losing its
    franchise in the Combined League (without even being required to pay its
    annual dues during its period of "darkness") – while the other League
    members were assessed $150,000 in order to provide financial assistance to
    the Adirondack team.

5.  The Debtor allegedly received disparate treatment from Defendant Wolf in
    addressing its financial difficulties.  The Debtor alleges that it, too, requested
    the opportunity to "go dark" during the 2002 season, but that Defendant Wolf
    refused the request.  As an alternative to "going dark," the Debtor requested
    assistance from Defendant Wolff in finding a buyer for the Allentown team.
    The Debtor asserts that although Defendant Wolff assisted the Adirondack
    team in locating a buyer,[9] he provided no similar assistance to the Debtor.

Debtor's Second Amended Complaint ¶¶15-28.

---

[7]  In connection with this episode, the Debtor further alleges that Defendant Wolff
improperly distributed the surcharged funds resulting in their use to pay the personal debts of the
Diamond Dogs' owner rather than the business debts of the team.  Debtor's Second Amended
Complaint ¶¶16-19.

[8]  When a team "goes dark," it does not field a team to play during a season.

[9]  The Complaint alleges that, with Defendant Wolff's assistance, the Adirondack
franchise was sold for $500,000.

After the 2002 season, the Combined League split apart.  The old NE League (which had

become the Eastern Division of the Combined League) reconstituted itself as the NAB, LLC.

The team members of the Eastern Division of the Combined League became the members of the

NAB, LLC and again used the name the Northeast League ("the New NE League").[10]  Wolff

Deposition at 12-15; Wolf Affidavit ¶¶10-14.  Compare Motion of North American Baseball,

LLC for Relief from the Automatic Stay (Doc. Entry #66 in Bky. 04-22368) with Debtor's

Response to Motion (Doc. Entry #70 in Bky. 04-22368).

After the formation of the New NE League, the Debtor claims that it again requested the

opportunity to "go dark" for the 2003 season or, alternatively, that the League provide financial

assistance to the team.  Both requests were denied.  Consequently, the Debtor alleges that it

suffered financial losses in excess of $350,000 during the 2003 season.  That fall, the Debtor

requested Defendant Wolff's assistance in negotiating a sale of the franchise to a group of

potential investors from Mahwah, NJ.  According to the Debtor, Defendant Wolff opposed that

potential sale of the franchise, but assisted yet another ailing New NE League team, the Catskill

team, by facilitating its sale to an ownership group located in Brockton, Massachusetts.  Debtor's

Second Amended Complaint ¶¶29-35.

On May 4, 2004, the Debtor filed this chapter 11 case.  The next day, the Debtor

announced that it would "go dark" for the 2004 season.  See Notes of Testimony of the

Preliminary Injunction Hearing held in Adv. 04-2390 (September 23, 2004) at 34-35 ("N.T.").

This announcement was made less than three (3) weeks before the scheduled start of the New NE

League's 2004 baseball season.  The New NE League immediately formed a team called "the

---

[10]  In this Opinion, I will refer to the NAB, LLC and the New NE League interchangeably.

Aces" to play the Debtor's schedule as a  a "gypsy" team (i.e., a team that plays all of its games as the visiting team).[11]  The Debtor did not field a baseball team during the 2004 season.  N.T. 38.

On July 2, 2004, the New NE League filed a Motion for Relief from the Automatic Stay in this Court.  As grounds for relief, the New NE League asserted that:

1.  the Constitution of the New NE League and related agreements constituted executory contracts under 11 U.S.C. §365;

2.  by failing to field a team, an act which occurred postpetition, the Debtor had breached the Constitution of the New NE League;

3.  the breach constituted grounds for termination of the Debtor's membership in the New NE League;

4.  the New NE League could not exercise its right to terminate the Debtor's membership without obtaining relief from the automatic stay; and

5.  the failure to continue operations in violation of an executory contract is a non-remediable breach, making the executory contracts non-assumable and providing cause under §362(d) for the grant of relief from the automatic stay.

In its Motion, the  New NE League requested "relief from the automatic stay to terminate the Debtor's membership in the League."   Doc. Entry #66 in Bky. 04-22368.  The Debtor responded to the Motion by asserting, inter alia, that relief should be denied to afford it the opportunity to cure the default of the executory contract and "collect the value of the franchise for the estate." Doc. Entry #70 in Bky. 04-22368.

On September 3, 2004, the New NE League withdrew its Motion for Relief from the

---

[11]  As explained in the text below and as set forth in the parties' Stipulation approved on May 16, 2006, the Debtor no longer contends that the formation and operation of the Aces franchise gives rise to any cognizable claims in this adversary proceeding.

Automatic Stay.  Doc. Entry #105 in Bky. 04-22368.  On September 23, 2004, the New NE

League held a membership meeting.  Prior to the meeting, the New NE League provided written

notice to its members and to the Debtor that the purpose of the meeting was to consider the

dissolution of the League (i.e., dissolution of the NAB, LLC entity).  A representative of the

Debtor was permitted to listen to the proceedings at the meeting through a telephone conference,

but was not permitted to speak or vote with respect to the dissolution issue.  At the meeting, the

members voted to dissolve the NAB, LLC.  Debtor's Second Amended Complaint ¶¶50-52.

On October 6, 2004, the former members of the New NE League formed a new league

known as the  Canadian American League of Professional Baseball with Defendant Wolff as the

Commissioner.  The new Canadian American League of Professional Baseball included all of the

former members of the now defunct New NE League.  The only team from the New NE League

not included in the Canadian American League was the Debtor.[12]  Debtor's Second Amended

Complaint ¶53.


## IV.  PROCEDURAL HISTORY OF THIS ADVERSARY PROCEEDING

As stated earlier, the Debtor commenced this case by filing a voluntary petition under

chapter 11 of the Bankruptcy Code on May 4, 2004.[13]  On September 20, 2004, the Debtor

_____

[12]  The "gypsy" team, the Aces, did not join the Canadian American League.  It does not
appear that the Aces entity was not a member of the NAB, LLC, but rather, was a team formed
by the NAB, LLC to replace the Allentown Ambassadors in the 2004 game schedule to provide
an opponent for the other teams in the League.

[13]  This bankruptcy case was assigned to the Hon. Thomas W. Twardowski of this Court's
Reading division.  When Judge Twardowski retired from the bench in February 2006, the case
was reassigned to the Hon. Richard E. Fehling.  Shortly thereafter, by Order entered February 21,
2006, Judge Fehling recused himself.  This bankruptcy case and this adversary proceeding were

11

initiated this adversary proceeding by filing a Complaint against seventeen (17) defendants.[14]  The

Defendants fell into three categories: (1) NAB, LLC; (2) the Team Defendants; and  (3) several

individuals (i.e., named Defendants who are natural persons) ("the Individual Defendants").[15]

On November 23,

The original Complaint included five (5) Counts, asserting claims for: (1) injunctive relief;

(2) recovery of money or property; (2) antitrust violations under 15 U.S.C. §§1 et seq.; (4)

violations of the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§1961 et seq.

("RICO"); and (5) automatic stay violations as provided in 11 U.S.C. §362(h).  On November 23,

2004, shortly after the Defendants filed a Motion to Dismiss the Complaint, the Debtor filed an

Amended Complaint that added an additional Count for "collusion and conversion."

On January 3, 2005, the Defendants filed a Motion to Dismiss the Amended Complaint.

On March 29, 2005, the Court denied the Defendants' Motion to Dismiss, conditioned upon the

Debtor filing a Second Amended Complaint pleading its claims with more specificity.

In its Second Amended Complaint, filed on April 19, 2005, the Debtor altered course

noticeably, asserting only the following three (3) claims:

---

then reassigned to the undersigned.

[14]  The seventeen (17) defendants originally named in the Complaint were: North
American Baseball, LLC, d/b/a the Northeast League, f/k/a Northern League, f/k/a Northeast
League; Miles Wolff, Commissioner; Daniel Moushon, League President; The Aces;
Lumberjacks Baseball, LLC, d/b/a The Bangor Lumberjacks; Chip Hutchins; Brockton
Professional Baseball, LLC, d/b/a The Brockton Rox; Van Schley; Flying Bats & Balls, LLC,
d/b/a The New Haven County Cutters; Jonathan Fleisig; Floyd Hall Enterprises, LLC, d/b/a The
New Jersey Jackals; Floyd Hall; Greg Lockard; Clyde Smoll; Spirit of New England Baseball
Club, LLC, d/b/a The North Shore Spirit; Nicholas Lopardo; Club du Baseball Professional de
Quebec, Inc., d/b/a The Capitales de Quebec.

[15]  When referring to all of the defendants collectively, I will use the term "the
Defendants." Otherwise, I will to refer the defendants specifically or by category.

12

- Count I - violation of the automatic stay, against all of the Defendants;

- Count II - breach of fiduciary duty, against Defendants Miles Wolff and Daniel Moushon[16] only; and

- Count III - breach of contract, against all of the Defendants.

On May 6, 2005, the Defendants filed another Motion to Dismiss the Second Amended Complaint.  On September 23, 2005, the Court entered an Amended Order which granted in part and denied in part the Defendant's Motion to Dismiss the Second Amended Complaint.  The September 23, 2005 Order:

- dismissed with prejudice all of the claims asserted in the Amended Complaint but omitted from the Second Amended Complaint (i.e., the claims for injunctive relief, for antitrust violations, for violations of the RICO statute and for "collusion and conversion");

- dismissed Count I as to all of the Individual Defendants;[17]

- provisionally dismissed the claim for breach of contract[18] as to all of the Defendants unless the Debtor filed a Third Amended Complaint within twenty (20) days "which states a claim for breach of contract."

The Debtor did not file a Third Amended Complaint, as authorized by the Court's September 23, 2005 Amended Order.  As a result, effective October 25, 2005, Count III of the Second Amended Complaint, for breach of contract, was dismissed and only two claims remained extant:

---

[16]  Mr. Moushon was alleged to be the "president" of the League.

[17]  Prior the issuance of the September 23, 2005 Amended Order, the Debtor moved to dismiss its claims against Clyde Smoll, one of the individual Defendants.  The claims against Mr. Smoll were dismissed with prejudice by Order entered August 10, 2005.

[18]  The Court's Order contains a clerical error.  It refers to the breach of contract claim as Count II.  It is clear from the context that the Court intended to refer to Count III.

13

1. Count I - under 11 U.S.C. §362(h) for violation of the automatic stay against all of the Team Defendants and the NAB, LLC;[19] and

2. the Count II - for breach of fiduciary duty against Defendants Wolff and Moushon.

On November 2, 2005, the remaining Defendants filed still another Motion to Dismiss the Second Amended Complaint – the present Motion. Since then, by stipulation of the parties approved by the Court's Order entered May 16, 2006, the remaining claims and parties were winnowed further as follows:

- the Allentown Aces was dismissed as a defendant;

- the Debtor's claim against individual Defendant Moushon for breach of fiduciary duty was dismissed;

- the Debtor's claim that the formation and operation of the Aces road team by one or more of the named Defendants during the Northeast League's 2004 season violated the automatic stay in the Plaintiffs underlying bankruptcy case was dismissed with prejudice.[20]

Thus, I must determine whether there are viable claims and triable issues of fact with respect to the Debtor's claims that: (1) the NAB, LLC and its individual corporate members, violated the automatic stay; and (2) Defendant Wolff breached a fiduciary duty to the Debtor.

---

[19] I have difficulty in understanding how the NAB, LLC could violate the automatic stay by being dissolved by its members. However, it is not necessary for me to resolve this conundrum at this time.

[20] See Stipulation to Dismiss Single Claim, To Dismiss Single Defendant and to Modify Caption of Adversary Proceeding ¶1 (Doc. Entry #85).

14

# V. <u>COUNT I -  VIOLATION OF THE AUTOMATIC STAY  - 11 U.S.C. §362(a)(3)</u>

## A. <u>Contentions of the Parties</u>

### 1. <u>The Debtor's Position</u>

In Count I of its Second Amended Complaint, the Debtor asserted that the members of the

NAB, LLC committed a knowing and willful violation of the automatic stay, giving rise to a right

to damages and counsel fees under 11 U.S.C. §362(h).[21]  In the course of litigating the present

Motion to Dismiss, the Debtor clarified that §362(a)(3) is the specific automatic stay provision

that it contends was violated by the Defendants.

Section 362(a)(3) provides that the filing of a bankruptcy petition "operates as a stay,

applicable to all entities, of  . . .  any act to obtain possession of property of the estate or of

property from the estate or to exercise control over property of the estate."  11 U.S.C. §362(a)(3).

The Debtor's legal theory, as refined during the course of the litigation, is that the

Defendants exercised possession or control over the Debtor's rights as a member of the LLC by

(1) dissolving the New NE League; and (2) reconstituting the League under a new name, the

---

[21]  In its prior Motion to Dismiss the Second Amended Complaint, the Defendants argued
that a corporate debtor may not invoke the remedies provided in §362(h).  In the September 23,
2005 Amended Order, Judge Twardowski rejected the Defendants' argument, concluding that
under applicable Third Circuit case law, a corporate debtor may assert such a claim,
notwithstanding the statute's textual reference to "an individual."  <u>See</u>, <u>e.g.</u>, <u>In re Atlantic
Business & Community Development Corp.</u>, 901 F.2d 325 (3d Cir. 1990). In their Memorandum
of Law in support of the present Motion, the Defendants expended considerable effort in
marshaling the arguments that the Court of Appeals' statement in <u>Atlantic Business</u> regarding the
applicability of §362(h) to a corporate debtor was "dictum" that I am not bound to follow, that
the "dictum" is against the great weight of authority and that I should reconsider Judge
Twardowski's decision.   I decline to reconsider Judge Twardowski's well-researched ruling,
particularly in light of his observation that "there are legal theories besides §362(h) for imposing
damages in favor of a corporate debtor if it succeeds in proving a violation of the automatic
stay."  <u>See generally</u> Fed. R. Bankr. P. 7015 (incorporating Fed. R. Civ. P. 15(b), which permits
amendment of the pleadings to conform to the evidence "at any time").

Canadian American League, without the Debtor as a member.[22]

### 2.  **The Defendants' Position**

The Defendants agree that the Debtor's membership the NAB, LLC was not terminated

prior to the commencement of this bankruptcy case on May 4, 2004.  The Defendants

acknowledge that the Debtor's interest in the LLC constituted property of the bankruptcy estate.

Defendants' Brief at 45-46; accord, In re Garrison-Ashburn, L.C., 253 B.R. 700, 708 (Bankr. E.D.

Va. 2000) (applying the law of Virginia).  However, the Defendants argue that under the NAB,

LLC Operating Agreement and applicable North Carolina law, the commencement of the

bankruptcy case terminated the Debtor's membership in the LLC and altered the Debtor's

property interest in the LLC from that of a "member" to that of an "assignee" of an LLC member.

The Defendants then reason that as an assignee, the Debtor had no management or voting rights

and that its only interest in the LLC was its right to receive its proportionate share of any

economic distribution made by the LLC.[23]  The Defendants argue that the Debtor's limited

economic interest was not affected by the dissolution of the LLC because "the Debtor's estate still

has the right to receive its pro-rata share of whatever may ultimately be distributed on account of

its surviving economic interest . . . ." and therefore, the Defendants have done nothing to exercise

---

[22]  Conspicuously absent from the Second Amended Complaint is any contention that the Defendants' actions in barring a representative of the Debtor from speaking or voting at the League meeting held on September 23, 2004 violated 11 U.S.C. §362(a)(3).  This omission is puzzling in light of the Debtor's theory that it retained a membership interest in the NAB, LLC even after the filing of its bankruptcy case.

[23]  For this reason, the Defendants also contend that the Debtor cannot state a claim under §362(h) for denying the Debtor the opportunity to speak or vote at the  League meeting of September 23, 2004 at which the NAB, LLC was dissolved.

control over the Debtor's intangible rights as an assignee.  Defendants' Memorandum of Law at

56.

        As for the formation of the Canadian American League, the Defendants argue that the

Debtor has not identified the existence of any right to be included in a new league or venture

formed by the Team Defendants.  I understand the Defendants to be contending that in the absence

of a right to participate in the new league, there is no "property of the estate" involved and

therefore, no possible violation of §362(a)(3).  In addition, the Defendants contend that even if the

formation of the Canadian American League violated the Debtor's rights, the conduct merely

gives rise to a postpetition cause of action under state law for breach of contract or perhaps for

some type of business tort, but that the Defendants' conduct, even if wrongful, is not to an

actionable claim for violation of §362(a)(3).[24]

**B.    Section 362(a)(3) May Stay Acts to Possess or Control Intangible Property Rights of the Bankruptcy Estate, Depending Upon (1) the Nexus Between the Conduct at Issue and the Property Interests of the Estate, (2) the Degree of Impact on the Bankruptcy Estate and (3) the Nature of Any Competing Legal Interests**

        This case involves the question of the legality of postpetition conduct which the Debtor

contends extinguished its intangible property rights as a member of an LLC.  The scope of

§362(a)(3) is the crux of the dispute between the parties.

        Section 362(a)(3) refers to the stay of acts "to obtain possession" of or "exercise control"

over "property of the estate."  The words and syntax of §362(a)(3) are not complex.  Nevertheless,

---

        [24]  I note that if the Defendants are correct and the formation of the Canadian American
League cannot give rise to liability under 11 U.S.C. §362(a)(3), the Debtor has abandoned all
breach of contract theories by failing to assert them in a Third Amended Complaint pursuant to
the Court's Amended Order of September 23, 2005.

bankruptcy courts have had difficulty delineating clear-cut principles to define the scope of the

stay imposed by §362(a)(3).

To accomplish these goals, §362(a) restrains a broad range of conduct, including the

11 U.S.C. §362(a)(3) is one of eight (8) subsections within the automatic stay provision of

the Bankruptcy Code, 11 U.S.C. §362(a).  The automatic stay provision is

> one of the fundamental debtor protections provided by the bankruptcy laws.   It
> gives the debtor a breathing spell from his creditors.   It stops all collection efforts,
> all harassment, and all foreclosure actions.   It permits the debtor to attempt a
> repayment or reorganization plan, or simply to be relieved of the financial
> pressures that drove him into bankruptcy.  The automatic stay also provides
> creditor protection.   Without it, certain creditors would be able to pursue their own
> remedies against the debtor's property.

In re Krystal Cadillac Oldsmobile GMC Truck, Inc., 142 F.3d at 637 (citing H.R. Rep. No. 95-

595, 95th Cong., 1st Sess. 340 (1977)); accord, Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d

Cir. 1995).

To accomplish these goals, §362(a) restrains a broad range of conduct, including the

continuation of litigation,[25] the enforcement of prepetition judgments,[26] the creation or

enforcement of liens against property of the estate[27] and, most broadly, "any act to collect, assess,

or recover a claim against the debtor" which arose prepetition.[28]  See generally Delpit v.

Commissioner, Internal Revenue Service, 18 F.3d 768, 772 (9th Cir. 1994) (observing existence of

"substantial overlap" among the subsections of §362(a) derived from Congress' intent to

comprehensively describe every action "that might impinge on the debtor's "breathing spell, even

---

[25]  11 U.S.C. §362(a)(1).

[26]  11 U.S.C. §362(a)(2).

[27]  11 U.S.C. §362(a)(4).

[28]  11 U.S.C. §362(a)(6).

though such an approach might result in some redundancy").

Section 362(a)(3)  is generally viewed as a provision designed to prevent the "dismemberment" of the bankruptcy estate until the bankruptcy process permits either a financial reorganization of the debtor or an orderly liquidation of the assets of the bankruptcy estate.  See, e.g.,  In re Burgess, 234 B.R. 793, 799 (D. Nev.1999); In re Spaulding Composites Co., Inc., 207 B.R. 899 (9th Cir. B.A.P. 1997); In re HSM Kennewick, L.P., 347 B.R. 569, 572 (Bankr. N.D. Tex. 2006).

By its plain text, the scope of §362(a)(3) is dependent on the meaning of the terms "property of the estate," "obtain possession" and "exercise control."

The meaning of the first term, "property of the estate," is relatively clear.  Property of the estate is a defined term in the Code.  With limited exceptions, "all legal and equitable interests of the debtor in property as of the commencement of the case" are included in the bankruptcy estate. 11 U.S.C. §541(a)(1).  Our Court of Appeals has repeatedly advised that the definition of "property of the estate" is to be read expansively.[29]  The expansive nature of §541's definition of property of the estate encompasses rights and interests arising from ordinary contractual relationships.[30]   This would include a debtor's interest in a limited liability company.[31]

_____

[29]  E.g., In re O'Dowd, 233 F.3d 197, 202 (3d Cir. 2000) (citing Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487, 490-91 (3d Cir. 1997).  But cf. Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 256 (3d Cir. 2001) (although the Code's definition of "property is broad, it "is not without limitations, and under certain concededly narrow circumstances, a federal agency's weighty interest in overseeing the administration of its grant programs can suffice to keep a grantee's interest outside of the Code's property definition").

[30]  Acands, Inc. v. Travelers Casualty and Surety Co., 435 F.3d 252, 260-261 (3d Cir. 2006); Westmoreland Human Opportunities, Inc., 246 F.3d at 242; In re Krystal Cadillac Oldsmobile Truck, Inc., 142 F.3d 631, 635 (3d Cir. 1998); 5 Collier on Bankruptcy ¶ 541.08[4],

Bankruptcy courts typically look to state law in ascertaining the existence and scope of the "legal

or equitable interests" of the debtor that comprise property of the estate under §541(a)(1).[32]

    The second concept in §362(a)(3), the stay of acts "to obtain possession of" of property of

the estate is often straightforward, especially when tangible property is involved.[33]  For example,

the post-petition repossession of a debtor's automobile is an obvious violation of §362(a)(3) (and,

―――――――――――――――

at 541-49 (15th rev. ed. 2006).

    [31]  Matter of Daugherty Construction, Inc., 188 B.R. 607 (Bankr. D. Neb. 1995).

    [32]  See Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 918 (1979) ("Congress has
generally left the determination of property rights in the assets of a bankrupt's estate to state
law.") (footnote omitted); O'Dowd, 233 F.3d at 202 ("While federal law defines what types of
property comprise the estate, state law generally determines what interest, if any, a debtor has in
property."). As a general principle, the property rights that become part of the bankruptcy estate
are burdened by the duties and limitations arising under the applicable nonbankruptcy law that
created those rights. Thus, unless overridden by specific provisions of the  Bankruptcy Code,
such as 11 U.S.C. §365(e), the property rights of the Debtor in this case as a member of the NAB,
LLC are limited by any restrictions arising under applicable state law, in this case, the law of
North Carolina.  See, e.g., In re Greater Southeast Community Hosp. Corp. I, 2006 WL 2793177,
at *30 n.62 (Bankr. D.D.C., September 21, 2006);  In re Garrison-Ashburn, L.C., 253 B.R. at
708; see also United Air Lines, Inc. v.  HSBC Bank USA, 416 F.3d 609, 615 (7th Cir. 2005), cert.
denied, 126 S.Ct. 1465 (2006).

    [33]  I do not mean to suggest that as a matter of law, the concept of "possession" cannot be
applied to intangible property.  See Acands, Inc., 435 F.3d at 260 (referring to an asserted
violation of §362(a)(3) based pm an act to obtain possession of the debtor's contractual right). I
merely point out that §362(a)(3) may be easiest to apply when tangible estate property is at issue.
Further, I note that even when tangible property is involved, §362(a)(3) is not without
interpretive difficulties.  There has been considerable judicial debate concerning the scope of
§362(a)(3) in cases in which the non-debtor took control of  the estate property prior to the
commencement of the bankruptcy case.  In that situation, some courts read §362(a)(3) to mean
that the non-debtor's continued control of the property is a violation of the stay, giving rise to a
duty to deliver the property to the debtor or the trustee.  E.g., In re Knaus, 889 F.2d 773 (8th Cir.
1989).  Other courts view §362(a)(3) more narrowly as designed only to prevent a post-petition
change in possession or control of estate property.  E.g., United States v. Inslaw, Inc., 932 F.2d
1467, 1474 (D.C. Cir. 1991) ("[t]he statutory language makes clear that the stay applies only to
acts taken after the petition is filed").  See generally 2 Norton Bankruptcy Law and Practice 2d
§36:7, at 36-34 to 36-35 & nn.2-3 (2006) (collecting cases).

quite possibly, other subsections of §362(a)).  In this case, the Debtor does not contend that the concept of "obtaining possession" of the intangible rights of the bankruptcy estate differs from or is more expansive than the concept of "exercising control" over intangible property of the estate. Therefore, I will not distinguish between possession or control of intangible property.

The scope of the concept, "to exercise control" over property of the estate is not certain, especially when intangible property is involved.  The words, "to exercise control," were not part of the Bankruptcy Code when the Code went into effect in 1978.  They were added to the statute in 1984.  See Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, §441(a)(2), 98 Stat. 33 (1984).

As a number of courts have observed, the term "to exercise control" is not defined in the Code and there is no legislative history which clarifies Congress' purpose in adding it to the statute.  See, e.g., United States v. Inslaw, Inc., 932 F.2d at 1473 n.3; In re Albion Disposal, Inc., 217 B.R. 394, 404-405 (W.D.N.Y. 1997).  The term has been described as "elusive" and one which can be defined only in a "case-by-case" manner because a "continuum of conduct exists which the Court must evaluate in determining whether [a party] has assumed control of property of the estate."  In re National Cattle Congress, 179 B.R. 588, 596-97 (Bankr. N.D. Iowa 1995), remanded on other grounds, 91 F.3d 1113 (8th Cir.1996).

The difficulty in defining the scope of §362(a)(3) is compounded by the requirement that the court apply the "elusive" and imprecise statutory term ("exercise control") to an abstract concept ("intangible property").  As one court has stated: "[Intangible] rights are incapable of real possession unless they are reified. Yet, (a)(3) preserves and guards against interference with them by staying any act to exercise control over estate property."  In re Stinson, 221 B.R. 726, 730

21

(Bankr. E.D. Mich. 1998) (quoting 1 David G. Epstein et al., Bankruptcy § 3-14, at 163 (1992)).

Given the interpretive difficulties just described, it is not surprising that §362(a)(3) case law involving acts "to exercise control" over intangible property of the estate may not be entirely consistent in their reasoning and outcome.

At one end of the spectrum are cases suggesting that a non-debtor's actions may so interfere – directly or indirectly – with the intangible rights of a debtor (or trustee), or so substantially diminish the value of the bankruptcy estate's intangible property rights, as to constitute a violation of 11 U.S.C. §362(a)(3).[34]  Dictum in a recent case from the Court of Appeals in this Circuit arguably supports this expansive construction of §362(a)(3).  See Acands, Inc., 435 F.3d at 259 (per Alito, J.) (stating that §362(a)(3) applies to actions directed against third parties, not only actions directed against the debtor and that post-petition entry of award in arbitration proceeding which could diminish the bankruptcy estate's insurance coverage violated

---

[34] See  Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 594 (9th Cir. 1993) (state agency's postpetition dissolution of corporate debtor constituted the exercise of control over estate property in violation of §362(a)(3)); In re Prudential Lines Inc., 928 F.2d 565, 574 (2d Cir.), cert. denied, 502 U.S. 821, 112 S.Ct. 82 (1991) (applying §362(a)(3) where a non-debtor's action would have the legal effect of diminishing or eliminating the bankruptcy estate interest in a "net operating loss"); In re Burgess, 234 B.R. at 798-99 (government revocation of chapter 11 debtor's business license is subject to §362(a)(3) as it would destroy the estate); In re Albion Disposal, Inc., 217 B.R. at 408-10 (applying §362(a)(3) to debtor's "estoppel claims" against township which enacted land use ordinance); In re J.F.D. Enterprises, Inc., 183 B.R. 342, 348-49 (Bankr. D. Mass. 1995) (government designation of "delinquency status" to entity which purchased package goods store license from the debtor violates §362(a)(3)); In re Bibo, Inc., 200 B.R. 348 (9th Cir. B.A.P. 1996) (senior lienholder's action in foreclosing against real property on which the debtor held a junior lien violated §362(a)(3) as completion of foreclosure process would extinguish the debtor's lienholder rights), appeal dismissed as moot, 139 F.3d 659 (9th Cir. 1998); In re Lehigh Valley Professional Sports Clubs, Inc., 2001 WL 1188409 at *4 (Bankr. E.D. Pa., September 7, 2001) (intangible right to operate baseball team in a minor league is subject to §362(a)(3)); In re National Cattle Congress, 179 B.R. at 597-98 (state agency revocation of greyhound racing license constitutes "maximum control" over estate property and destroys its value, rendering conduct violative of §362(a)(3)).

both §362(a)(1) and (a)(3)).

Other courts posit that not every postpetition action taken by a third party that reduces the

value of property of the bankruptcy estate constitutes the exercise of control of property of the

estate in violation of 11 U.S.C. §362(a)(3).  One court has broadly stated the principle as follows:

> subsection 362(a)(3) does not bar every proceeding hostile to a debtor's claimed
> interest in property, no matter how intangible, unmatured or unliquidated the
> debtor's claim, and no matter how indirect the attack upon the estate's interest in
> property.

In re Gyncor, Inc., 251 B.R. 344, 355 (Bankr. N.D. Ill. 2000) (quoting In re Continental Airlines

61 B.R. 758 (S.D. Tex. 1986)); see also In re Levitz Furniture Inc., 267 B.R. 516, 522 (Bankr. D.

Del. 2000).

So how does one distinguish between conduct which violates §362(a)(3) from conduct

which does not?  From my review of the case law, I perceive at least two common rationales used

by those courts which have circumscribed the scope of §362(a)(3).

First, some courts have found §362(a)(3) inapplicable because no discrete property rights

of the bankruptcy estate were directly targeted by the conduct at issue. These cases sometimes

involve an action directed by one non-debtor against another non-debtor which has the potential,

incidental consequence of impairing the value of the property rights of the bankruptcy estate.

Under this approach, there is no violation of §362(a)(3) based on the consequences of the indirect

actions even if the quantitative impact on the value of the estate is substantial.[35]

---

[35]   See In re UAL Corp., 412 F.3d 775 (7th Cir. 2005) (§362(a)(3) not applicable to
proposed sale of stock in the debtor corporation owned by ESOP, even though proposed sale
could have adverse effect on the debtor's interest in loss carryforwards); In re Gyncor, 251 B.R.
at 355 (lawsuit filed by lender that had allegedly breached a loan commitment to purchaser of the
debtor's assets is not a violation of §362(a)(3) as all claims against the lender belonged to other

Second, even if the challenged conduct constitutes a direct impairment of the debtor's property rights, some courts treat the debtor's claim solely as a postpetition cause of action arising under the applicable law giving rise to the debtor's property interest.[36]  In this line of cases, the courts have found that the postpetition breach of a valid property interest of the debtor is not an independent violation of §362(a)(3).[37]

I do not find either of these two limiting principles fully satisfactory.  With respect to the

_____

parties and not the debtor); In re Albion Disposal, Inc., 217 B.R. at 405-06 (enactment of a zoning law of general applicability does not violate §362(a)(3) even if value of the bankruptcy estate's real property is substantially reduced thereby); Amplifier Research Corp. v. Hart, 144 B.R. 693, 694 -695 (E.D. Pa. 1992) (lawsuit against bankruptcy debtor for alleged postpetition defamation does not violate §362(a)(3) as plaintiff did not seek control of the debtor's property, but only restraint of the debtor's tortious use of its property); In re HSM Kennewick, L.P., 347 B.R. at 572 (in bankruptcy case of member of an LLC, court rejects argument that lawsuit filed by other member of LLC against the LLC so reduced the value of the debtor's membership interest so as to constitute a violation of §362(a)(3)); In re Levitz Furniture Inc., 267 B.R. at 521 (action by minority shareholders of a corporation to enjoin their corporation from entering into certain agreements with the debtor in connection with the debtor's chapter 11 plan held not a violation of §362(a)(3); In re Marvel Entertainment Group, Inc., 209 B.R. 832, 838-39 (Bankr. D. Del. 1997) (shareholders' actions in electing new board of directors of debtor does not violate §362(a)(3)).

[36]  See In re Golden Distributors, Ltd., 122 B.R. 15, 19-20 (Bankr. S.D.N.Y. 1990) (unlike efforts to divert collection of a debtor's accounts receivable, alleged breach of restrictive covenants by former employees or improper solicitation of the debtor's customers was not a violation of 11 U.S.C. §362(a)(3) even though it may be otherwise actionable).  See also United States v. Inslaw, Inc., 932 F.2d at 1473-1474 (debtor's allegation of ongoing violation of its rights, occurring both prepetition and postpetition under a software licensing agreement may be actionable breach of contract, but not a violation of §362(a)(3); In re West Coast Video Enterprises, Inc., 145 B.R. 484, 487 (Bankr. E.D. Pa. 1992) (same).

[37]  There is a third line of cases under §362(a)(3) involving government regulatory actions – typically involving issues of renewal, transfer and termination of licenses.  In this context, some courts have read the exception to the automatic stay in 11 U.S.C. §362(b)(4) to compel a narrow construction of §362(a)(3) or to override §362(a)(3) entirely.   See, e.g., In re Yellow Cab Co-op Association, 132 F.3d 591 (10th Cir. 1997); In re Beker Industries, Inc., 57 B.R. 611 (Bankr. S.D.N.Y. 1986).  Since the case before me does not involve government regulatory action, I need not further analyze this line of cases.

24

first rationale, it may be very difficult to distinguish between actions which "directly" impair the

intangible property rights of the debtor (or trustee) from actions which only have an "indirect"

impact on the estate.  Moreover, the approach fails to address the underlying purpose of

§362(a)(3), the preservation of the estate for the benefit of creditors.  I also find the second

rationale unconvincing.  Consider the case of a creditor who repossesses a debtor's automobile

postpetition in violation of the debtor's contractual rights (the contractual rights having been

violated because the debtor was in compliance with all of his obligations under the agreement).

As a matter of either policy or statutory construction, I fail to see why the existence of a non-

bankruptcy remedy for a violation of a debtor's rights under applicable non-bankruptcy law

precludes the debtor from invoking other remedies available under the Bankruptcy Code for the

violation of §362(a)(3).

Despite the flaws I detect in these rationales, I perceive and can identify a policy issue

underlying these decisions that merits consideration.  In the cases restricting §362(a)(3), the courts

acknowledge the Code's goal of protecting the property interests of the bankruptcy estate.  When

the courts limit the scope of §362(a), they do so to avoid giving the bankruptcy estate an undue

legal advantage in its relationship with other parties. Though perhaps not explicitly, the courts are

engaging in a process of balancing competing interests – the interests of the bankruptcy system in

protecting the value of the bankruptcy estate against the interests of other parties who seek to

engage in ordinary-course commercial conduct which may engender negative consequences for the

bankruptcy estate after a bankruptcy case has commenced.[38]  To the extent that a determination of

---

[38]   This tension, between protection of the bankruptcy process and the bankruptcy estate's
ordinary interaction with other parties finds expression in other Code provisions as well.  See,
e.g., In re Price, 370 F.3d 362, 377 (3d Cir. 2004) (in construing 11 U.S.C. §521, discussing

the scope of §362(a)(3) requires the balancing of competing interests, as I read the cases to

suggest, the determination becomes, essentially, a public policy decision.  The court must weigh

bankruptcy policy, which seeks to protect estate assets in order to promote the rehabilitation of

distressed businesses or the orderly and effective liquidation of failed enterprises, against other

competing societal interests.  Put another way, there may be a narrow sphere in which the nexus

between the non-debtor conduct and the adversely affected property interests of the estate is so

attenuated in comparison to the competing legal interests of the non-debtor, that it would be

inappropriate to apply §362(a)(3) to the non-debtor's conduct.

How can the competing policies I described be duly recognized in a case involving

§362(a)(3)?  The determination whether a non-debtor's acts constitute the exercise of control over

the intangible property rights of the bankruptcy estate in violation of 11 U.S.C. §362(a)(3) requires

several steps.  First,  the court must determine whether the bankruptcy estate has a property right

under applicable non-bankruptcy law.  Next, the court must determine whether those property

rights are property of the bankruptcy estate and the scope of the estate's property interests.  See In

re Spaulding Composites Co., Inc., 207 B.R. 899, 907 (9th Cir .B.A.P 1997).  Third, if the non-

debtor's actions will adversely impact the estate's property interests, the court must then evaluate

(1) the nexus between the conduct at issue and the property interests of the bankruptcy estate, (2)

---

whether permitting chapter 7 debtor to retain motor vehicle and maintain installment payments to
creditor secured by the vehicle –  rather than requiring that the debtor either reaffirm the debt or
redeem,or surrender the vehicle -- provides the debtor with a "head start" rather than a "fresh
start"); In re Zick, 931 F.2d 1124, 1128 (6th Cir. 1991) (in determining whether §707(a) includes
requirement that chapter 7 case be filed in good faith, expressing principle that Congress
intended to give chapter 7 debtors opportunity for a "fresh start," not a "head start"); In re
Norton, 867 F.2d 313, 317-18 (6th Cir. 1989) (construing 11 U.S.C. §525 to avoid result the court
considered would provide the debtor with a "head start" rather than a "fresh start").

the degree of impact on the bankruptcy estate[39] and (3) the competing legal interests of the non-

debtor parties.  Based on these factors, the court can determine whether the challenged conduct

falls inside or outside of the boundary lines of conduct prohibited by §362(a)(3).[40]

.

## C.    The Defendants Are Not Entitled to Summary Judgment on the Debtor's Claim that Their Conduct Constituted the Exercise of Control Over the Debtor's Intangible Property Rights in Violation of 11 U.S.C. §362(a)(3)

As discussed above, the outcome of the §362(a)(3) inquiry may be influenced greatly by

the determination of the nature of the Debtor's interest at the time of the dissolution of the New

NE League and the formation of the Canadian American League.  The main thrust of the

Defendants' argument is that after the commencement of the bankruptcy case, by operation of law,

---

[39]  This inquiry is necessary because §362(a)(3) prohibits acts to "exercise control" over estate property.  It may be necessary to consider the quantitative effect on the estate's rights in order to decide whether the non-debtor's conduct rises to the level of "control."

[40]  I am aware that a consequence of this approach is a potential lack of certainty as to whether §362(a)(3) will apply in a particular situation.  This, in turn, may make it more difficult for parties to circumscribe their conduct to keep it within lawful bounds.  While this may not be an entirely desirable outcome, the stakes must be kept in perspective.  All that is involved is whether a party's conduct is subject to the automatic stay.  If there is any doubt whether §362(a)(3) applies, a party can seek clarification of the scope of the automatic stay or modification of the automatic stay from the court.  See In re Daniels, 316 B.R. 342, 352-53 (Bankr. D. Idaho 2004); In re Peterkin, 102 B.R. 50, 53 -54 (Bankr. E.D.N.C. 1989); see also In re Fidelity American Mortgage Co., 19 B.R. 568 (Bankr. E.D. Pa. 1982).  Bankruptcy courts regularly grant relief from the stay pursuant to 11 U.S.C. §362(d).  Such proceedings are handled on an expedited basis.  See generally 11 U.S.C. §362(e) (automatic stay against property of the estate terminates by operation of law (30) thirty days after motion is filed under §362(d) unless the court orders the stay to remain in effect after making certain required findings).  Thus, the automatic stay may only briefly delay a party from taking action.  Conversely, from the debtor's perspective, if there is uncertainty regarding the scope of §362(a)(3), the debtor can seek a "non-automatic" stay from the bankruptcy court under 11 U.S.C. §105(a).  See In re Calpine Court, 2006 WL 3040777 (Bankr. S.D.N.Y., October 25, 2006); In re Monroe Well Service, Inc., 67 B.R. 746 (Bankr. E.D. Pa. 1987).

the Debtor's interest in the NAB, LLC was transformed and reduced in such a manner that the

Defendants' act of dissolving the LLC fell outside scope of §362(a)(3).

In order to evaluate the merits of the Defendants' argument, first, I need to ascertain the

nature of the Debtor's property rights in the NAB, LLC.  To accomplish this, I must examine the

North Carolina Limited Liability Company Act, N.C.G.S.A. §§ 57C-1-01 et seq. ("the NCLLCA")

and the Operating Agreement of the NAB, LLC ("the Operating Agreement").  Then, I must

determine whether the provision of the Operating Agreement which purports to modify the

Debtor's rights as an LLC member upon the filing of a bankruptcy case is enforceable under the

Bankruptcy Code.  Once I have analyzed the nature of the bankruptcy estate's property rights, I

can return to the original question  –  whether the Defendants' conduct amount to the exercise of

control over those property rights in violation of 11 U.S.C. §362(a)(3).

After the lengthy analysis set out below, I conclude that the record has not been developed

adequately to permit me to make a determination as to the enforceability of the provision of the

NAB, LLC Operating Agreement that purported to terminate the Debtor's property interest as a

full-fledged member of the NAB, LLC.  Therefore, at this stage of the proceeding, I cannot rule

out the possibility that the Debtor retained its membership status in the LLC after it filed its

bankruptcy case. This possibility leads me to conclude that the Defendants are not entitled to

summary judgment on the Debtor's claim under 11 U.S.C. §362(a)(3).

**1.  Prior to Commencement of the Bankruptcy Case, the Debtor Had Intangible Membership Rights in the NAB, LLC, Including Certain Management Rights Purportedly Terminated By the Debtor's Bankruptcy Filing Pursuant to the *Ipso Facto* Provision of the NAB, LLC Operating Agreement**

The Defendants acknowledge that as of the commencement of the Debtor's bankruptcy case, the Debtor held a membership interest in the NAB, LLC.  An LLC is "a conceptual hybrid, sharing some of the characteristics of partnerships and some of corporations."  In re DeLuca, 194 B.R. 65, 74 (Bankr. E.D. Va. 1996).  In particular, an LLC "combines the two most critical features of all of the other business organizations in a single business organization -- a corporate-styled liability shield and the pass-through tax benefits of a partnership."  Carter G. Bishop, Treatment of Members upon Their Death and Withdrawal from a Limited Liability Company: the Case for a Uniform Paradigm, 25 Stetson L. Rev. 255, 258 (1995).

Under the NCLLCA, a membership interest in an LLC is considered "personal property." N.C.G.S.A. §57C-5-01.  A membership interest in an LLC encompasses: (1) a right to vote on LLC matters; (2) a right to participate in the management of the LLC; and (3) a right to share in the profits and losses of the LLC.  Id. § 57C-1-03; see also In re DeLuca, 194 B.R. at 76 (describing in the same manner the nature of a membership interest under Virginia Limited Liability Company Act, Va. Code Ann.§§ 13.1-1000 to 13.1-1069).

The NCLLCA provides that unless otherwise provided in an LLC's articles of organization or written operating agreement, upon the filing of a bankruptcy petition, the member ceases to be a "member" and has "only the rights of assignee" as provided in §57C-5-02.  N.C.G.S.A. §57C-3-02.  The NAB, LLC Operating Agreement does not "provide otherwise."  It provides that upon bankruptcy filing member shall "cease to have any power as a Member or a Manager" and shall

29

have "only the rights . . . of a transferee [under] Section 7.3". See Operating Agreement §4.4.[41]

By terminating a member's status upon a bankruptcy filing, §4.4 of the Operating Agreement is

what is commonly known as "*ipso facto* provision."

Under §57C-5-02 of the NCLLCA, an assignee or transferee is entitled to receive "only the

distributions and allocations to which the assignor would be entitled but for the assignment."

N.C.G.S.A. §57-C-5-02. The filing of a bankruptcy case by a member, however, does not dissolve

the LLC. Id.    Again, the NAB, LLC Operating Agreement is consistent with the statute. The

filing of a bankruptcy by an LLC member is *not* among the events that cause the dissolution of the

LLC. See Operating Agreement §8.1

The NCLLCA provides that an LLC member has a right to voluntarily assign its

membership interest. N.C.G.S.A. §57-C-5-02. ("Except as provided in the articles of

organization or a written operating agreement, a membership interest is assignable in whole or in

part."). Again, the Operating Agreement does not "provide otherwise." See Operating

Agreement §7.4.[42] However, the right to assign a membership interest is restricted. As stated

above, an assignee does not have an unconditional right to all of the incidents of membership. The

assignee's rights are limited to "the distributions and allocations to which the assignor would be

_____

[41] The NAB, LLC appears to contain a scrivener's error. Section 4.4 cross references
§7.3 as the provision which sets forth the rights of an assignee. In fact, it is §7.4 that sets forth
the rights of a transferee.

[42] Section 7.4 of the Operating Agreement provides that a transferee has none of the
rights of a member except for right to receive proportionate share of LLC's tax allocations and
distributions of assets). See also Operating Agreement §1.1 (definition of "ownership interest"
distinguishes between membership rights and transferee's rights).

entitled but for the assignment." Id.[43]  An assignee may be admitted as a member of the LLC, but

that right is qualified.  The statute provides that, except as otherwise provided in an LLC's articles

of organization or operating agreement, an assignee must receive the unanimous consent of the

members in order to become a member of the LLC.  Id. §57C-5-04(a).[44]


> **2.  To Evaluate the Enforceability of  the _Ipso Facto_ Provision of the NAB, LLC
> Operating Agreement, It Is Necessary to Determine Whether the Operating
> Agreement Is an Executory Contract**

The Debtor contends it remained a member of the NAB, LLC following the filing of this

bankruptcy case because the _ipso facto_ provision of  the Operating Agreement[45] purporting to

terminate its membership interest is not enforceable pursuant to 11 U.S.C. §365(e).  Debtor's

Memorandum of Law at 21-22.  The Defendants argue that the _ipso facto_ provision of the

Operating Agreement and the NCLLCA is enforceable.

Section 365 of the Bankruptcy Code provides that an _ipso facto_ provision is not

---

[43]  It is worth noting that the enactment of statutory restrictions on the transferability of a
membership interest found in the NCLLCA may have been driven by tax considerations that no
longer are relevant.  See In re Garrison-Ashburn, L.C., 253 B.R. at 705-06; Neely, 71 Am. Bankr.
L.J. at 279-81; Moll, 40 Wake Forest L. Rev. at 930-32.

[44]  On this point, the NAB, LLC's Operating Agreement appears to "provide otherwise."
It states that an assignee shall be admitted as a member if certain conditions are met, one of
which is the consent of a "Majority in Interest of the Disinterested Members."  Operating
Agreement §7.3(b).  But cf. id. §4.5 (providing for admission of member who acquires an
ownership interest but only if, inter alia, "[a]ll Members have unanimously consented in writing .
. . the granting or denial of which consent shall be in the sole discretion of such Members").

[45]  Operating Agreement §4.4; see also N.C.G.S.A. §57C-3-02(3)(c).

31

enforceable against the bankruptcy estate in some circumstances.  See 11 U.S.C. §365(e).[46]  Before

considering the reach of §365(e), the threshold question is whether 11 U.S.C. §365 is applicable to

the *ipso facto* provision of the NAB, LLC.  This requires a determination whether the Operating

Agreement is an "executory contract" within the meaning of the Bankruptcy Code.

---

[46] Section 365(e) provides:

> (1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, <u>an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on</u>--

>> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>> (B) <u>the commencement of a case under this title</u>; or
>> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

> (2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if–

>> (A) (i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

>>> (ii) such party does not consent to such assumption or assignment; or

>> (B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

11 U.S.C. §365(e) (emphasis added).

### 3.   The NAB, LLC Operating Agreement Is An "Executory Contract"

The term "executory contract" is not defined in the Code but, fortunately, the reported

decisions provide guidance on the issue.  As the court observed recently in In re Exide

Technologies, Inc., 340 B.R. 222, 229 (Bankr. D. Del. 2006),

> courts in this Circuit utilize the Countryman standard, which provides that a contract is
> executory when "the obligation of both the bankrupt and the other party to the contract
> are so far unperformed that the failure of either to complete performance would
> constitute a material breach excusing performance of the other." Vern Countryman,
> *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973).

See also  Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39 (3d Cir.

1989).

Under the Countryman standard, the inquiry is whether both parties to the contract have

unperformed obligations that would constitute a material breach if not performed.  If so, the

contract is executory.  In this inquiry, the four corners of the parties' agreement are examined to

determine whether both parties have material, unperformed obligations as of the commencement

of the bankruptcy case.  In evaluating whether there are material unperformed obligations,

applicable non-bankruptcy law is considered.  See Id.; see also In re Shareholders Funding, Inc.,

188 B.R. 150, 159 -160 (Bankr. E.D. Pa. 1995); In re Monge Oil, Inc., 83 B.R. 305, 306 -307

(Bankr. E.D. Pa. 1988).

Here, I conclude that the Operating Agreement is an executory contract.  I find that the

members of the NAB, LLC had ongoing, material, unperformed obligations to one another and the

LLC as of the commencement of this bankruptcy case.  These obligations included: (1) the duty to

manage the LLC[47] and (2) the duty to make additional cash contributions if needed by the LLC.[48]

My finding is consistent with that of other courts which have considered operating agreements of

LLC's.[49]

### 4. The Present Record Does Not Permit A Finding that the *Ipso Facto* Provision of the Operating Agreement Is Enforceable Under 11 U.S.C. §365(e)

#### a. In Applying 11 U.S.C. §365(e), the Court Must Consider the Assumability and Assignability of the Executory Contract under 11 U.S.C. §365(c), and 11 U.S.C. §365(f)

The question is whether §4.4 of the NAB, LLC Operating Agreement provision, the *ipso*

*facto* provision that purports to terminate the Debtor's membership upon its bankruptcy filing, is

nullified by 11 U.S.C. §365(e)(1)(B).

_____

[47] Operating Agreement §3.1.

[48] Id. §§5.2, 5.3.  I also note that in its Motion for Relief from the Automatic Stay filed on July 2, 2004, the NAB, LLC asserted that the failure to field a team for the 2004 season was a material default of the Debtor's obligations under Paragraph 7 of "the League Constitution." Motion of North American for Relief from the Automatic Stay ¶18-19, 27-28  (Doc. Entry #66 in Bky. 04-22368).  However, no "League Constitution" has been made part of the record, the Motion for Relief from the Automatic Stay was withdrawn and I can find no provision in the NAB, LLC Operating Agreement setting forth any obligation to operate a baseball team.

[49] See In re DeLuca, 194 B.R. at 77; Matter of Daugherty Construction, Inc., 188 B.R.  at 612; Milford Power Co., LLC v. PDC Milford Power, LLC, 866 A.2d 738, 750 (Del. Super. 2004); cf. In re Garrison-Ashburn, L.C., 253 B.R. at 708-09 (LLC operating agreement not an executory contract because it contained "no obligation to provide additional capital; no obligation to participate in management; and no obligation to provide any personal expertise or service to the company).  See generally In re Catron, 158 B.R. 629, 634 (E.D. Va.1993), aff'd mem., 25 F.3d 1038 (4th Cir. 1994) (collecting cases supporting majority rule that partnership agreements generally are deemed "executory contracts"); Thomas F. Blakemore, Limited Liability Companies and the Bankruptcy Code: A Technical Review, 13 Am. Bankr. Inst. J. 12, 42 (1994) (LLC operating agreements should be considered executory contracts due to members' "management, voting, financial and other duties").

Section 365(e)(1) prohibits termination or modification of an executory contract after the commencement of a bankruptcy case due to a contractual provision conditioned on the commencement of a bankruptcy case.  However, §365(e)(2) overrides subsection (e)(1) if applicable law excuses a party from accepting performance from the trustee or an assignee and the party does not consent to assumption or assignment of the executory contract.  Language similar to §365(e)(2) is found in §365(c),[50] which governs assumption and assignment of executory contracts.  Section 365(c) states that executory contracts are neither assumable nor assignable if applicable law excuses a party from accepting performance from an entity other than the debtor or

---

[50] Section 365(c) provides:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if --
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
>    (B) such party does not consent to such assumption or assignment; or
>
> (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; or
>
> (3) such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

11 U.S.C. §365(c) (emphasis added).

35

debtor-in-possession ("DIP").[51]

In a case, such as this, in which the scope of §365(e)(1) is at issue, the construction given

§365(c) gains increased importance due to the statement of our Court of Appeals' in In re

Woskob: "In interpreting [§365(e)(2)'s] limitation of §365(e)(1), we must . . . consider the impact

of §365(c), which closely tracks the language of §365(c)(2)."  305 F.3d 177, 186 (3d Cir. 2002);

accord, Summit Investment & Development Corp. v. Leroux, 69 F.3d 608, 612 (1st Cir. 1995).

Thus, as stated in one commentary,

> [t]he extent to which a court will enforce an ipso facto provision under section
> 365(e)(2) of the Bankruptcy Code largely depends upon whether the court would
> permit the debtor to assume the contract . . . .

Michelle Morgan Harner, Carl E Black & Eric R. Goodman, Debtors Beware: The Expanding

Universe of Non-Assumable/Non-Assignable Contracts in Bankruptcy, 13 Am. Bankr. L.J. 187,

253 (2005) ("Harner, Black & Goodman").[52]

Construction of §365(c) is complicated further by its uncertain relationship to §365(f).[53]

---

[51]  This linkage between assumption and assignment in §365(c) has been criticized on
policy grounds.  See Daniel J. Bussel & Edward A. Friedler, The Limits on Assuming and
Assigning Executory Contracts, 74 Am. Bankr. L.J. 321, 323 (2000) ("Bussel & Friedler);  Brett
W. King, Assuming and Assigning Executory Contracts: A History of Indeterminate "Applicable
Law," 70 Am. Bankr. L.J. 95, 109-14 (1996) ("King").

[52]  In this case, consideration of §365(c)(1) has potentially dispositive consequences.  If
the Debtor's membership status in the NAB, LLC is non-assumable, §362(a)(3) may have no
applicability to actions taken by the Defendants to exercise control over the Debtor's property
rights.  See In re Watts, 876 F.2d 1090, 1094-96 (3d Cir. 1990).  For a further discussion of the
issue whether the automatic stay encompasses a debtor's rights under an executory contract
which is non-assumable under 11 U.S.C. §365(c)(1), see Harner, Black & Goodman, 13 Am.
Bankr. L.J. at 244-48.

[53]  Section 365(f) provides:

Section 365(f) provides that an executory contract is assignable notwithstanding a contractual

provision or "applicable law," prohibiting assignment.  However, it is expressly subject to

§365(c), which states that "applicable law" excusing a party from accepting performance from an

entity other than the debtor renders an executory contract non-assignable (and non-assumable).

So, an executory contract is assignable notwithstanding "applicable law" prohibiting assignment,

but subject to "applicable law" prohibiting assignment!  "What § 365(f)(1) appears to give,

§365(c)(1)(A) seems to take away."  <u>Cinicola v. Scharffenberger</u>, 248 F.3d 110, 121 n.11  (3d Cir.

2001).[54]

---

> (1) Except as provided in subsections (b) and (c) of this section, notwithstanding a
> provision in an executory contract or unexpired lease of the debtor, or in
> applicable law, that prohibits, restricts, or conditions the assignment of such
> contract or lease, the trustee may assign such contract or lease under paragraph (2)
> of this subsection.
>
> (2) The trustee may assign an executory contract or unexpired lease of the debtor
> only if--
>
>> (A) the trustee assumes such contract or lease in accordance with the
>> provisions of this section; and
>>
>> (B) adequate assurance of future performance by the assignee of such
>> contract or lease is provided, whether or not there has been a default in
>> such contract or lease.

11 U.S.C. §365(f).  I have quoted §365(f) as amended by BAPCPA.  The differences between the
BAPCPA version of §365(f) and the version in effect when this bankruptcy case was commenced
are not material.

> [54] One court in another circuit expressed its frustration with the statutory text as follows:
>
>> I cannot say with any sense of intellectual honesty that I believe that traditional
>> approaches to legal analysis will lead to a principled conclusion. In my view the
>> reality is that in attempting to accommodate competing policy interests, all of
>> which are of substantial weight, Congress has enacted statutes which impose

**b. Section 365(e)(1) Overrides a Contractual *Ipso Facto* Provision Unless (1) An Applicable Statute or the Common Law Unequivocally Prohibits an Assignment of the Contract Without the Non-Debtor's Consent or (2) the Identity of the Assignee Would Be Material to the Non-Debtor, Taking into Consideration the Nature of the Enterprise in Which the Debtor and the Non-Debtor Are Engaged**

Section 365(c) and (f) are difficult provisions to understand, harmonize and apply. Although early decisions construed §365(c)(1) narrowly to apply only to "personal service contracts,"[55] subsequent decisions have found no basis in the text of the provision to so limit its scope.[56] There may now be as many as seven (7) lines of cases addressing the meaning of and interrelationship between §365(c) and (f).[57] One commentary summarizes the case law construing §365(c) and (f) as follows:

> Most courts, however, have resolved the apparent conflict between sections 365(c)(1) and 365(f) by ascribing a different meaning to the phrase "applicable law" appearing in each section. For example, the United States Court of Appeals for the First Circuit has interpreted the phrase "applicable law" in section 365(f) as applying only to state laws that enforce contract provisions that prohibit, restrict or condition assignment, and the phrase "applicable law" in section 365(c)(1) as applying to state laws that, on their own terms, prohibit, restrict or condition assignment of a particular type of contract.
>
> . . .

———————————————

> conflicting mandates and has created a statutory scheme leaving interstices which the courts necessarily must fill on a case by case basis. Under these circumstances I will not ornament my holding with a facade of precedent or references to what I deem to be inconclusive statutory language.

In re Antonelli, 148 B.R. 443, 447 (D. Md. 1992).

[55] This refers to contracts which deal with personal services or skills or involve personal trust or confidence. See In re Taylor Manufacturing, Inc., 6 B.R. 370 (Bankr. N.D. Ga. 1980).

[56] For a discussion of the development of the case law on this subject, see King, 70 Am. Bankr. L.J. at 99-111.

[57] Id. at 114-20.

> Other courts have **. . .** attempted a similar method of resolving the apparent conflict between sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code.  For example, the United States Courts of Appeal for the Fourth, Sixth, Ninth and Eleventh Circuits have interpreted the phrase "applicable law" in section 365(f)(1) as applying to general prohibitions against assignment, and the phrase "applicable law" in section 365(c)(1) as applying to specific laws that excuse a contracting party from rendering performance to, or accepting performance from, a third party. Under this construction, section 365(c)(1) applies when the identity of the original contracting party is material.

Harner, Black & Goodman, 13 Am. Bankr. L.J. at 198-201 (footnotes omitted).[58]


### West Electronics

The leading case in this Circuit construing §365(c) is <u>Matter of West Electronics, Inc.</u>, 852 F.2d 79 (3d Cir. 1988).  In <u>West Electronics</u>, the court held that a chapter 11 DIP, which had a prepetition supply contract with the United States, could not assume the government contract because "applicable law," 41 U.S.C. §15, required government consent to the assignment of the contract.

<u>West Electronics</u> is prominent as the first appellate case establishing "the hypothetical test" for assumability of an executory contract under §365(c).  Under the "hypothetical test" for the assumability of an executory contract, regardless whether a debtor-in-possession actually intends to assign an executory contract, the court must analyze whether "applicable law" would require the

---

[58] The cases cited in support of the propositions in the quoted material in the text are: <u>In re Sunterra Corp.</u>, 361 F.3d 257, 266-67 (4th Cir. 2004); <u>In re Catapult Entertainment, Inc.</u>,165 F.3d 747 (9th Cir.), <u>cert. dismissed</u>, 528 U.S. 924, 120 S. Ct. 369 (1999); <u>In re James Cable Partners, L.P.</u>, 27 F.3d 534 (11th Cir. 1994); <u>In re Magness</u>, 972 F.2d 689, 695 (6th Cir. 1992);  <u>In re Pioneer Ford, Inc.</u>, 729 F.2d 27 (1st Cir. 1984).  <u>Cf.</u> <u>In re Catron</u>, 158 B.R. at 637 (suggesting that §365(c) and (f) are irreconcileable).

non-debtor party to consent if, "hypothetically," the DIP attempted to assign the contract.[59]  "In

other words, if a contract could not be assigned under applicable nonbankruptcy law, it may not be

assumed or assigned by the trustee [or the DIP]."[60]  Cinicola v. Scharffenberger, 248 F.3d at 121.

Significantly, for purposes of the instant case, if a contract cannot be assumed under the §365(c)

"hypothetical test" employed in this Circuit, a contractual provision modifying or terminating the

debtor's rights under the contract will be enforceable due to the close relationship between

§365(c)(1) and §365(e)(2).  If §365(c)(1) is applicable, so is §365(e)(2).  Once §365(e)(2) is

applicable, it overrides §365(e)(1).[61]

------------------------------------------------

[59]  Some courts of appeals have followed West Electronics and adopted "the hypothetical
test." In re Sunterra Corp., 361 F.3d 257, 266-67 (4th Cir. 2004); In re Catapult Entertainment,
Inc., 165 F.3d 750; In re James Cable Partners, L.P., 27 F.3d 534 (11th Cir. 1994)  Other courts of
appeals have rejected the test in favor of an "actual test" or "as applied" test, pursuant to which
§365(c)(1) will apply only after "a showing that the nondebtor party's contract will actually be
assigned or that the nondebtor party will in fact be asked to accept performance from or render
performance to a party – including the trustee – other than the party with whom it originally
contracted."  In re Mirant Corp., 440 F.3d 238, 248 (5th Cir. 2006); accord,  Summit Investment
& Development Corp. v. Leroux, 69 F.3d at 612.

[60]  This restriction on the power to assume an executory contract does not apply if there is
actual consent by the non-debtor party.  11 U.S.C. §365(c)(1)(B); In re Woskob, 305 F.3d at 187.
Obviously, in the case sub judice, there has been no consent to assumption by the non-debtor
parties to the Operating Agreement.

[61]  I note that what is "hypothetical" about the "hypothetical test" for assumption of an
executory contract is the hypothesis that the debtor or the trustee will be assigning the contract
after assumption. After that hypothesis has been made, the next question – whether "applicable
law" excuses performance the non-debtor from performing or accepting performance after the
hypothetical assignment –  requires separate analysis.  Nothing in West Electronics suggests that
this separate analysis is anything other than an analysis of the law of assignability as applied to
the type of contract at issue.  As elaborated below in the text, I read West Electronics to require a
bankruptcy court evaluating the assumability of an executory contract under §365(c)(1) (and the
enforceability of an ipso facto provision under §365(e)(1) and (2)) to examine the executory
contract at issue and determine whether applicable law  (be it statutory or common law)
precludes the assignment of the contract without the consent of the non-debtor.  See In re
Headquarters Dodge, Inc., 13 F.3d 674, 683 (3d Cir. 1993).

40

In West Electronics, the "applicable law" in question was 41 U.S.C. §15, which provides:

> No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned.

In analyzing this statute, the Court of Appeals observed that the statute is "meant to secure to the government the personal attention and services of the contractor." Thus, in West Electronics, the court construed "applicable law" (41 U.S.C. §15) as treating government contracts as per se, classic "personal service contracts" that traditionally may not be assigned without consent. This led the court to hold that §365(c)(1) prevented assignment (and, under the hypothetical test, assumption of the contract by the DIP).

By comparison, the relevant statute in this case is more equivocal. The NCLLCA provides that a membership interest in a North Carolina LLC "is assignable in whole or in part." N.C.G.S.A. §57C-5-02. However, pursuant to the NCLLCA, only the right to "the distributions and allocations to which the assignor would be entitled but for the assignment" is assignable unconditionally. Id. The right of an assignee to become a full fledged "member" requires unanimous consent of the other members. Id. §57C-5-04(a). The ability to characterize the nature of the statutory assignment provisions is clouded further by the fact that all of these statutory provisions are subject to being overridden by an LLC's articles of organization or operating agreement.[62] Thus, one might characterize a membership interest under the NCLLCA as "somewhat assignable."[63]

---

[62] In this case, the statutory unanimity requirement for admission of a new member may have been overridden by the NAB, LLC Operating Agreement. See n.46, supra.

[63] Bussel & Friedler, 74 Am. Bankr. LJ. at 336. See generally Id. at 333 (differentiating among contracts that are (1) freely assignable; (2) assignable with consent that may not be

The ultimate question under §365(c)(1) is whether the qualified power to assign a

membership interest under the NCLLCA constitutes applicable law that "excuses a party, other

than the debtor . . . from or rendering performance to an entity other than the debtor or debtor in

possession."[64] within the meaning of §365(c)(1)(A). Due to the differences between the statute at

issue in <u>West Electronics</u> and the NCLLCA, I do not find the answer to this question in the Court

of Appeals' decision. Therefore, I look to other reported decisions for guidance.


### In re ANC Rental Corp.

In <u>ANC Rental Corp.</u>, 277 B.R. 226 (Bankr. D. Del. 2002), the debtor sought to assume

executory contracts permitting the operation of car rental concessions at several different airports.

In several of the locations, there were local ordinances providing generally that no commercial

activity could take place at the airport without the written permission of the airport authorities.

The court found the contracts to be assumable and §365(c)(1) inapplicable, reasoning as follows:

> Although the concessions are located at the airports, public safety concerns are not
> implicated by the question of who runs a car rental service as opposed to who operates
> an airline . . . . Furthermore, none of the statutes applicable to the Concession
> Agreements . . . preclude assignment of those Agreements or even require the Airport
> Authorities' consent to such an assignment. Thus, the statutes themselves do not
> demonstrate any overriding concern for the exact identity of the party with whom the
> Airport Authorities contract.

---

unreasonably withheld; (3) freely assignable but subject to express restrictions on assignment
which are narrowly construed unless the assignment would materially alter the rights or burdens
of the non-assigning party or violate public policy; and (4) non-assignable without the consent of
the of the other party due to valid statutory or common law restrictions).

[64] The text of 11 U.S.C. §365(e)(2) differs only slightly, referring to "the trustee or to an
assignee of such contract or lease," rather than the debtor or debtor in possession."

277 B.R. at 237.

In its decision, the bankruptcy court stated the general proposition that

for section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue.

Id. at 236.[65]

---

[65] In support of this principle, the court set forth the following survey of the existing case law:

Perlman v. Catapult Entertainment, Inc. ( In re Catapult Entertainment, Inc.), 165 F.3d 747, 750-51 (9th Cir. 1999) (patent law renders non-exclusive patent licenses personal and non-assignable under § 365(c)(1)); City of Jamestown v. James Cable Partners, L.P. ( In re James Cable Partners, L.P.), 27 F.3d 534, 537 (11th Cir. 1994) (city ordinance prohibiting assignment of cable franchise without city approval was mere general prohibition against assignment and insufficient to constitute applicable law under section 365(c)(1)); West Electronics, 852 F.2d at 83 (contract for the manufacture of military equipment was personal services contract which was non-assignable under government anti-assignment statute and § 365(c)(1)); In re Cajun Elec. Power Co-op., Inc., 230 B.R. 693, 708-09 (Bankr. M.D. La. 1999) (state law that prohibited transfer of assets without majority vote of the members of electric cooperative did not prevent assumption and assignment of contracts where identity of party was not central to the contract); In re Lil' Things, Inc., 220 B.R. 583, 591 (Bankr. N.D. Tex. 1998) (§365(c)(1) not applicable to Texas statute which is "merely a general prohibition against assignments made without consent of the lessor"); In re Fulton Air Service, Inc., 34 B.R. 568, 573 (Bankr. N.D. Ga. 1983) ("A lease for improved real property does not constitute a contract for nondelegable personal service" and therefore does not fall under exception of § 365(c)(1)).

While not stated explicitly in the decision, in construing §365(c)(1) to require a specific statutory expression of an anti-assignment policy, the court may have been influenced by the general bankruptcy policy of fostering the rehabilitation of the debtor in a reorganization and maximizing the return to creditors in a liquidation. As one commentator has stated, "[b]ecause an executory contract is potentially the most valuable asset of the estate, undue restrictions would be contrary to the fundamental goals of the Code." King, 70 Am. Bankr. L.J. at 123; accord, In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir.), cert. denied, 531 U.S. 873, 121 S.Ct. 175 (2000) ("[t]he Code generally favors free assignability as a means to maximize the value of

Although the factual setting and "applicable law" of <u>ANC Rental</u> differ considerably from this case, the decision is helpful for its clear articulation of the principles to be applied in analyzing whether a statute that conditions or restricts the right to assign a contract is "applicable law" within the meaning of 11 U.S.C. §365(c)(1) and (e)(2).[66]

### In re IT Group, Inc.

<u>In re IT Group, Inc.</u>, 302 B.R. 483 (D. Dela. 2003) involved a fact pattern closer to, but not entirely on "all fours," with this case.   In <u>IT Group</u>, the debtor was a member of a Delaware LLC. Like the NCLLCA, the Delaware statute provided for the assignability of an LLC membership interest but only upon approval of all of the members of the LLC, except as otherwise provided in the LLC agreement.  6 Del. C. §18-702(a).  It also provided that upon assignment, a member ceases to be a member, but the assignee is entitled to share in profits and losses.  <u>Id.</u> §18-702(b). Finally, the Delaware statute also provided that a member "ceases to be a member" of an LLC upon the filing of a bankruptcy petition.  <u>Id.</u> §18-301.

After filing its bankruptcy case, the debtor in <u>IT Group</u>, apparently accepting the

---

the debtor's estate").

[66]  I note that the standard employed by the court in <u>ANC Rental Corp.</u> is consistent with that urged in some of the scholarship on the subject.  <u>See</u> King, 70 Am. Bankr. L.J. at 124 (advocating standard for assumability and assignability of executory contract based on materiality of the identity of the person rendering the debtor's performance).  <u>See generally</u> Bussel & Friedler, 74 Am. Bankr. L.J. at 335-38 (advocating construction of §365(c) making it applicable to those few situations in which applicable law absolutely prohibits assignment absent consent and inapplicable to the more frequent situations in which applicable law restricts or conditions but does not prohibit assignment).

44

termination of its membership interest, sought to assign its economic interests in the LLC (i.e., the right to share in the profits and losses) to a third party. At issue in the appeal was the enforceability of a contractual provision that purported gave the other LLC members the right to purchase the debtor's economic interest under a contractual formula that would have reduced the value of the debtor's interest. Under the contractual provision, the purchase option became effective upon a bankruptcy filing by a member. The bankruptcy court found the provision to be unenforceable *ipso facto* provision under §365(e)(1).

On appeal, the district court found determinative the Delaware statutory provision that permitted an LLC member to assign its economic rights, concluding that the statute did "not excuse the Members from rendering economic performance to an assignee." 302 B.R. at 487. Consequently, the court affirmed the bankruptcy court's decision, holding that the §365(e)(2) exception to §365(e)(1) was inapplicable and that the other LLC members' contractual right to buy-out the debtor's economic interest in the LLC upon the filing of a bankruptcy case was an unenforceable *ipso facto* provision.

The IT Group decision is instructive in two respects. First, it suggests that the §365(c)(1) and §365(e)(2) inquiry into whether applicable law excuses the non-debtor from accepting performance from another party should be applied to the each separate property interest that arises under a single contract, rather than to the contract as an inseverable whole.

The decision also might be suggesting that an affirmative grant of authority to assign a contractual interest set forth in a statutory provision is sufficient to render §365(e)(1) applicable and §365(e)(2) inapplicable. However, that may read too much into the decision. Like the

45

NCLLCA, the Delaware statute appears to impose no conditions or restrictions on the assignment

of the economic interests of a member of an LLC.  The assignment of the membership interest

itself, however, is subject to the unanimous consent of the other LLC members, as under the

NCLLCA.  Since the assignability of the membership interest itself was not at issue in IT Group, I

do not find the decision completely apposite.


### In re DeLuca and In re Antonelli

At issue in In re DeLuca, was the validity of a provision of an LLC operating agreement

provision that purported to dissolve an LLC upon the bankruptcy filing of any member.  The

dispute focused on the purported removal of the debtor as the LLC manager by the other LLC

members prior to the bankruptcy filing and the election of a new manager after the bankruptcy

filing.  The court found that the LLC's operating agreement required only a majority vote of the

members to remove the LLC manager and therefore, validated the prepetition action of the other

members of the LLC in removing the debtor as the LLC manager.  However, the operating

agreement required a unanimous vote to elect a new manager.  The other members then purported

to elect a new manager by "continuing" the dissolved LLC after the bankruptcy filing, without the

debtor's participation, pursuant to a provision of the operating agreement.  After "continuing" the

LLC without the debtor, the other members elected a new manager. The debtor asserted that the

dissolution provision was an unenforceable *ipso facto* provision.  The court rejected the debtor's

argument.

The DeLuca court began by observing that a substantial overlap exists between the

characteristics of a partnership and an LLC: (1) the absence of free transferability of the ownership

interests of a member or a partner;[67] (2) the right to participate in the profits, losses and

distributions; and (3) the right to participate in the management of the company.  Concluding that

the treatment of partnerships interests in bankruptcy provides the closest analogy to the interests of

an LLC member, the court then scrutinized the existing case law regarding the effect of a

bankruptcy filing on the interest of a general partner.  The court found the cases divided on the

question whether a partnership inherently involves a relationship in which applicable law excuses

one partner from accepting performance from or rendering performance to an entity other than the

debtor.  194 B.R. at 76 & nn.22-23 (citing cases).  The court resolved the conflict by following the

reasoning of the court in In re Antonelli, a case involving the assignability of a debtor's interest in

numerous general partnerships involving real estate development.  148 B.R.  at 444-45.  So, I will

digress briefly to summarize the Antonelli decision.

       In Antonelli, the court started with the premise that

> a sensible way to reconcile Section 365(f) and Section 365(c) is to read the words
> "applicable law" in Section 365(f) as applying to laws prohibiting assignments by
> express mandate or express validation of contractual anti-assignment provisions and to
> read the same words in Section 365(c) as applying to the underlying common law
> principle excusing under certain circumstances the non-assigning party from
> performance even in the absence of an express anti-assignment rule.

---

[67]    [M]embership interests in a limited liability company, unlike shares of stock in a
corporation, are not freely transferable mirrors the restriction on entry of new
members into a partnership, which ordinarily cannot occur without the agreement
of all existing members.

In re DeLuca, 194 B.R.  at 74.

47

148 B.R. at 448 (citing In re Magness, 972 F.2d at 689).[68]  The court then reasoned that the

applicable partnership statute appeared on its face to be one which set forth a general rule against

assignment and therefore was subject to nullification under §365(f).  However, the court found the

need for a  "further inquiry" under §365(c)(1), i.e., whether "the non-debtor party to a contract is

excused from performance if the identity of the debtor is a material condition of the contract when

considered in the context of the obligations which remain to be performed under the contract."

Id.  This inquiry, in turn

> calls for a particularized, practical approach rather than a conceptual one to the
> assignment question.   Thus, the question of whether or not management power in a
> partnership is assignable turns not upon the status which "applicable law" generally
> accords to partnership agreements but upon the materiality of the identity of the
> partners to the performance of the obligations remaining to be performed under the
> partnership in question.

Id.  The court then observed that the materiality of the identity of the partner in a partnership

depends upon the nature of the enterprise in which the partnership is engaged.

> Many different types of partnerships and many different types of general partners
> exist.   In certain circumstances, the identity of a general partner will be critical to the
> limited partners and to the prospects for a successful investment.   Examples of such
> circumstances include:  (1) a real estate development partnership in which the general

---

[68]  The court acknowledged a degree of pragmatism in employing this approach:

> I do not pretend that this distinction is not somewhat facile. Pure anti-assignment
> rules are relatively rare, in large part because the law prohibiting assignments has
> naturally grown in the common law process by litigation of cases in which the
> non-assigning party seeks to be excused of performance. Nevertheless, the
> distinction is one which the language of Section 365(f) and 365(c) itself suggests,
> and it is one which I believe opens the way to a thoughtful and just resolution of
> the issues.

In re Antonelli, 148 B.R. 443, 448

partner must administer the planning, construction and leasing of a building;  (2) an investment partnership in which the general partner is to identify and evaluate investments of the partnership;  and (3) any partnership in which the general partner is required to contribute additional capital to the partnership and, indeed, may have control over the issuance of capital calls to all partners.   Similarly, the identity of each general partner is significant in a general partnership comprised of professional persons, such as lawyers or accountants.

<u>On the other hand, partnerships exist in which the identity of a general partner is less significant.   These may include (1) real estate partnerships owning matured projects that require only routine management and leasing functions and (2) certain large syndication operations that administer a network of separate partnerships.   In these cases, it is arguable that another organization with sufficient resources could take over the work of the original general partner without material detriment to the limited partner investors.</u>

<u>Id.</u> at 449 (emphasis added).  <u>See generally</u> Douglas K. Moll, <u>Minority Oppression and the Limited Liability Company: Learning (Or Not) from Close Corporation History</u>, 40 Wake Forest L. Rev. 883, 886 & n.11 (2005) ("Moll") (referring to study of LLC's showing that 26% were in field of engineering and management, 19% were real estate businesses,  12% were in construction industry, 9% were investment companies and 33% were in various other industries).

In <u>Antonelli</u>, the court found that the debtor's role in the partnership was essentially that of an investor and therefore, his identity was not material to the partnership. Thus, the debtor's partnership interest was assumable under §365(c)(1).

The <u>DeLuca</u> court employed the same analysis as the <u>Antonelli</u> court and focused on the nature of the business involved and the contractual obligations to be assigned.  The court found that the LLC involved was "a paradigm example of a development project where the identity of the managers is material to the very existence of the company."  194 B.R. at 77.  Consequently, the <u>DeLuca </u>court found that the <u>*ipso facto*</u> dissolution provision of the LLC operating agreement

fell within the §365(e)(2) exception to §365(e)(1) and was enforceable.

From the cases that I have discussed, I can synthesize a process for applying §365(e) and analyzing the enforceability of the *ipso facto* provision of the NAB, LLC Operating Agreement that purported to terminate the Debtor's membership interest in the LLC. The process will require either two (2) or three (3) steps.

First, I must identify the specific nature of the contractual property rights that are at issue. See In re IT Group, Inc., 302 B.R. at 487. Second, I must consider whether the contractual rights are assignable under applicable law, by evaluating whether the governing LLC statute or common law expresses a clear policy that the identity of the contracting party is crucial to the contract or to public safety with respect to the type of contract at issue. See Matter of West Electronics, 852 F.2d at 83; ANC Rental, Inc., 277 B.R. at 236. If so, the contract is not assignable and any *ipso facto* provision is enforceable. If, on the other hand, the governing statute or common law is equivocal, I go to a third step: determining whether the identity of an assignee would be material to the non-debtor, taking into consideration the nature of the enterprise in which the debtor and the non-debtor are engaged.[69]  See In re DeLuca, 194 B.R. at 77; accord, Sally S. Neely, Partnerships and Partners and Limited Liability Companies and Members in Bankruptcy: Proposals for Reform, 71 Am. Bankr. L.J. 271, 319 (1997) ("Neely"); see also In re Headquarters Dodge, Inc., 13 F.3d at

---

[69]  I note that this entire analysis is a hypothetical evaluation of the assignability of the membership interest. It is consistent with West Electronics in that the identity of the potential assignee remains hypothetical.  What is not hypothetical is the focus on nature of the debtor's business and the legitimate expectations of the non-debtor party to the executory contract.  I also observe that this inquiry is merely a threshold evaluation of the assignability of the bankruptcy estate's interest in an executory contract.  For an actual assignment to occur, the debtor (or trustee) must satisfy the requirements of 11 U.S.C. §365(b).

684  (remanding case for determination under §365(c)  whether executory contract was a "personal

services contract" and describing the issue as "involv[ing] questions of fact").

> **c.    The North Carolina Limited Liability Company Act Is Not "Applicable
>         Law" that Unequivocally Prohibits an Assignment of the Contract
>         Without the Non-Debtor's Consent and the Present Record Does Not
>         Support a Finding that the Identity of an Assignee of the Debtor's
>         Membership Interest Would Be Material to the Other LLC Members**

### Step 1 - the nature of the bankruptcy estate's contract rights

As I have discussed earlier, the Debtor's statutory rights as a member of the NAB, LLC

encompass (1) a right to share in the profits and losses of the LLC; (2) a right to vote on LLC

matters; and (3) a right to participate in the management of the LLC.  Operating Agreement §§3.1,

4.1-4.2.1.5;  accord; N.C.G.S.A.§ 57C-1-03.  For purposes of analysis, I can condense these rights

into two categories: (1) management rights as a member; and  (2) purely economic rights.

However, the Debtor's retention of the economic rights, as to which there is no dispute, raises no

§365(e) issue because there is no *ipso facto* provision of the Operating Agreement that purports to

modify the Debtor's economic rights based upon their bankruptcy filing.  The Defendants do not

dispute this proposition.

### Step 2 - the assignability of the bankruptcy estate's contract rights under applicable law

The dispute in this case concerns the Debtor's management rights and status as a member

of the LLC.  After the bankruptcy filing, was the Debtor still a member or was the Debtor's status

altered to that of an assignee by virtue of §4.4 of the Operating Agreement?  In order to determine

51

that §4.4 is an enforcible *ipso facto* provision notwithstanding §365(e)(1), I would have to find

that the Debtor's rights are non-assignable under §365(c)(1).

I agree with the court in <u>In re ANC Rental, Inc.</u>, that §365(c)1) requires a clear,

unambiguous prohibition against assignment without the consent of the other parties to the

contract.  The North Carolina statute does not meet this standard.

Earlier, I characterized  applicable law North Carolina law governing assignment of the

management rights as a member an LLC as treating the membership interest as "somewhat

assignable."  I pointed to the statute's starting proposition that a membership interest in a North

Carolina LLC "is assignable <u>in whole </u>or in part."  N.C.G.S.A. §57C-5-02 (emphasis added).  I find

it significant that the NCLLCA could have been drafted to state simply that a member's

membership rights are not assignable.  Instead, the North Carolina legislature framed the policy by

beginning with a positive statement of assignability.  This suggests that any anti-assignment policy

embodied in the statutory provisions is not absolute.

I also find it significant that to the extent that other provisions of the NCLLCA restrict the

assignment rights of a membership interest, those statutory provisions are subject to exceptions

that may be set forth in the LLC's articles of organization or operating agreement.  <u>See</u> <u>Id.</u>; <u>Id.</u>

§57C-5-04(a). I do not perceive the NCLLCA as enacting a definitive, inflexible anti-assignment

policy.  Rather, the statute provides a  "default provisions applicable where the  . . . members, for

one reason or another, do not explicitly agree" on the rules for assignment of membership

interests.  Neely, 71 Am. Bankr. L.J. at 320 -321.

I am cognizant that my analysis is heavily dependent on semantics.  The NCLLCA can

easily be construed to mean that the management components of a member's rights are not

assignable because the same provision that renders membership interests assignable also states

that an assignee does not become a member.  Further, the statute provides elsewhere that the right

of an assignee to become a full fledged "member" requires unanimous consent of the other

members (absent contrary provisions in the articles of organization or the operating agreement).

Id. §§57-5-02, 57C-5-04(a).  These arguments are not without some force.  However, on balance,

given the strict standard imposed by 11 U.S.C. §365(c)(1), I believe that the NCLLCA lacks the

unequivocal expression of a statutory non-assignability policy required to give it the force of

"applicable law excus[ing] a party . . .  from accepting performance from or rending performance

to"  an assignee within the meaning of 11 U.S.C. §365(c)(1) and (e)(2),[70]


**Step 3  -  consideration of the nature of the business enterprise and the materiality of the**
**identity of the assignee**

Finally, I must consider whether the nature of the operations the NAB, LLC are such that a

change in the identity of an assignee would be a material impairment of the rights of the other

members.  I find the current record in this case inadequate to permit me to draw a definitive

conclusion on this issue.

As discussed earlier, the LLC structure may be used as the form of entity for many types of

business enterprises.  The same has been said about the partnership form.  Certain types of LLC's

_____

[70]  I point out again that the consequence of this legal conclusion is not that the Debtor's
membership rights are necessarily assignable, but only that I must go one step further in the
analysis of determining whether they are not assignable under §365(c)(1).

and partnerships will fit the classic format of an executory contract "based upon personal trust and confidence" in which the change of identity of a member would materially impair the rights of the other LLC members.  See In re Harms, 10 B.R. 817, 821 (Bankr. D. Colo. 1981); accord, In re Catron, 158 B.R. at 627; In re Manor Place Development Associates, L.P., 144 B.R. 679 (Bankr. D.N.J. 1992).  See generally  In re Antonelli, 148 B.R. at 447 (referring to personal service contracts with non-delegable duties such as "ones involving opera singers, painters, authors or football players").  However, other businesses may be organized in the partnership or LLC form in which the identity of the other principals may not be material.  One example, in the case of an LLC, is a syndication that operates a network of partnerships.[71]  In re Antonelli, 148 B.R. at 449.

From the information presently available to me concerning the purpose and operations of the NAB, LLC, I cannot make a determination whether the identity of a member is a material aspect of the Operating Agreement or, instead, whether the only material prerequisites to the admission of a new member to the LLC are the proposed member's ability to perform its obligations under the Operating Agreement.  See 11 U.S.C. §365(b) (requiring adequate assurance of a cure of past defaults and of future performance for assumption of executory contract); Id. §365(f)(2) (requiring adequate assurance of future performance for assignment).

There are certain indicia in the record suggesting that memberships in this particular LLC do not carry with them the type of non-delegable duties that should render the membership non-assignable under §365(c)(1).  For example, while I have very little detail about the transactions,

---

[71]  This is not to say that the identity of the other member of an LLC is entirely irrelevant. Certain attributes, such as financial ability, may be material.  However, such concerns are more appropriately addressed when evaluating assumability under the standards set forth in 11 U.S.C. §365(b), rather than §365(c)(1).

the record suggests that in the past, team membership in the New NE League and its predecessors

may have been assigned with some regularity.  Further, while the record also is not well developed

on this point, it would appear that the business operations of the NAB, LLC may have been

relatively modest as compared to the level of business activity conducted by the member teams in

fielding their individual teams.[72]  Thus, as long as a prospective member has the requisite financial

strength and some expertise in the "business" of baseball, the other members of the NAB, LLC

may have little concern over the identity of any member that might purchase an assignment of the

Debtor's membership interest.  These indications suggest, hypothetically, that assumption by the

Debtor of its membership interest and the assignment of the membership to a qualified assignee

would not contravene the legitimate expectations of the other members of the LLC.  Finally, while

the Operating Agreement does provide that the NAB, LLC is managed by its members making a

decision by action of a majority in interest,[73] the Operating Agreement also provides for the

appointment of a President (Defendant Wolff), who is "responsible for day-day management of the

Company."  The fact that the NAB, LLC is, at least to some degree, a "manager-centric" LLC,

may minimize the degree of "personal trust" and "confidence" that each member need necessarily

place in the other members of the LLC.

     At this stage of the case, at summary judgment, when I must make all reasonable

---

[72]  In other words, the primary function of a NAB, LLC membership may have been to
provide authorization to operate a minor league team in conjunction with the other teams in the
league.  If so, the value of the membership may derive not from the potential profits that the
NAB, LLC might generate, but rather from the opportunity that membership provides to generate
operational profits and the potential appreciation in the value of the membership.  In this sense,
the membership may have served as the functional equivalent of a business license.

[73]  See Operating Report §3.1.

inferences in favor of the non-moving party (the Debtor), the inferences stated in the preceding paragraph suggest that the Debtor's membership may fall outside of the class of executory contracts that are non-assumable under §365(c)(1).  If the Debtor's membership interest is potentially assumable notwithstanding §365(c)(1), then the same reasoning would lead me to conclude that the *ipso facto* provision of the Operating Agreement, which purports to terminate the membership interest, is not enforceable under 11 U.S.C. §365(e)(1) and(e)(2).

I emphasize that I am making no finding at this time that the Debtor's membership interest actually survived the *ipso facto* provision of the NAB, LLC. The record is inadequate for such a definitive ruling.  See In re Headquarters Dodge, Inc., 13 F.3d at 684 (remand for factfinding as to whether an executory contract is a personal services contract under applicable nonbankruptcy law).  Rather, I hold only that at the summary judgment stage, the Defendants have not established that the Debtor's membership interest in the NAB, LLC was terminated as a result of the filing of the Debtor's bankruptcy case.

Based on the foregoing analysis, I must reject the Defendants contention that the only property interests at issue under 11 U.S.C. §362(a)(3) are the Debtor's economic rights as an assignee of a membership interest in the NAB, LLC.  For purposes of the Motion, I must also assume that the Debtor may have retained its status as a member of the LLC.  With that in mind, I can return to the core question  –   whether the Defendants are entitled to summary judgment on the Debtor's §362(a)(3) claim.

**5.  The Present Record Does Not Establish that the Bankruptcy Estate's Property
Interests Were So Insubstantial or the Justification for the Defendant's
Actions Dissolving the LLC to the Detriment of the Estate as to Warrant
Entry of Summary Judgment Against the Debtor on Its §362(a)(3) Claim**

I have engaged in the elaborate analysis above in an effort to identify with some precision
the nature of the Debtor's property interests, if any, that may have been materially impaired by the
Defendants' actions in dissolving the NAB, LLC and then forming the Canadian American
League.  I have not been entirely successful, but I have determined that I cannot rule out the
possibility that the Debtor's property interests included its full membership interest in the NAB,
LLC.  In addition, the Defendants concede that even if the Debtor's membership status in the
NAB, LLC terminated upon its bankruptcy filing, the Debtor retained its economic rights as an
assignee.

I conclude that the Defendants are not entitled to dismissal of Count I of the Second
Amended Complaint.

The postpetition survival of the Debtor's economic rights in the NAB, LLC, by itself,
provides a basis for the denial of the Motion as to Count I.  Applying the test I articulated above in
Part V.B., I find that the Debtor's §362(a)(3) claim is viable.

The Defendants' actions adversely affected the Debtor's economic rights in the LLC
because dissolution terminated the potential for ongoing distributions from the future business
activities of the NAB, LLC.   In other words, the dissolution of the LLC terminated the potential
generation of profits in the future and their distribution to the Debtor in its capacity as an assignee.
 This destruction of the Debtor's economic rights follows directly from the act of dissolving the

LLC.[74]  Thus, there is a direct nexus between the Defendants' conduct and the negative impact on

the property interest of the bankruptcy estate.  Further, there is nothing in the record suggesting

that any business exigency existed requiring the dissolution of the NAB, LLC without first

obtaining relief from the automatic stay or the existence of any other competing interests to justify

overriding the routine application of §362(a)(3).  Therefore, on the present record, I find that the

Debtor's claim that the Defendants acts constituted the exercise of control of property of the estate

is not subject to dismissal by way of summary judgment.

There is a second, independent basis for denial of the Motion. The bankruptcy estate

included what may have been a property interest that was, possibly, more valuable than the

Debtor's economic rights as an assignee  – i.e., the membership interest in the NAB, LLC –  and

the Defendants have not established that the Debtor's membership status terminated when this

bankruptcy case was filed.  The Complaint alleges that at least one minor league team was sold for

$500,000 and no evidence to the contrary was presented by the Defendants.[75]  By dissolving the

NAB, LLC, Team Defendants effectively eliminated the Debtor's property interest and they did so

without permitting the Debtor to exercise its voting rights.  Indeed, had the Debtor been permitted

---

[74]  At this point in the case, I also have no basis for placing a value on the Debtor's
economic rights as an assignee of the LLC.  It is possible that the economic rights have little
value once they have been separated from the full membership interest in the NAB, LLC.
Theoretically, however, these economic rights may have been valuable.  On summary judgment,
the Debtor is entitled to the benefit of the doubt on this point.

[75]  This is not to say that I am finding that the value of a membership interest in the NAB,
LLC was $500,000 (or the $750,000 posited by the Debtor).  The present record will not support
a valuation of the membership interest.  It is quite possible that the value of the Debtor's
membership interest, assuming that it was not terminated by the *ipso facto* provision of the
Operating Agreement, may have been worth substantially less than those amounts, particularly
given the Debtor's distressed economic state or other relevant considerations.

to vote at the September 23, 2004 NAB, LLC membership meeting, there could have been no

dissolution of the LLC due to the unanimity requirement in §8.1(b) of the Operating Agreement.

Therefore, I see a direct connection between the Defendants' conduct and the destruction of a

potentially valuable property right of the bankruptcy estate.

It is also of some significance that the Defendants initially appeared to recognize their

obligation to seek relief from the automatic stay in order to terminate the Debtor's membership

interest.  The motion for relief from the automatic stay was based on a theory that the Debtor's

postpetition conduct (going "dark") had materially breached its obligations under the executory

contract and provided cause for relief from the automatic stay under 11 U.S.C. §362(d).  The

Defendants withdrew the motion and proceeded on the theory that the Debtor's membership

interest had terminated by operation of law, that its membership was not assumable under

§365(c)(1) and that relief from the automatic stay was not necessary to dissolve the NAB, LLC.  In

proceeding in this fashion, the Defendants made certain legal assumptions that may yet turn out to

be accurate.  But rather than seek judicial clarification of the extent of the Debtor's property

interest and the scope of the automatic stay, they took action to demolish the NAB, LLC and

thereby shifted the burden to the Debtor to enforce the automatic stay.  If the Defendants' legal

assumptions turn out to incorrect, they acted at their own peril.  As one court has stated, the

Defendants "elected to require Debtor to obtain a judicial determination of the issues.

Consequences attend that decision." In re Daniels, 316 B.R. at 353. If it is determined ultimately

that the Debtor's membership interest in the LLC survived the *ipso facto* termination, the

consequences may be monetary liability under 11 U.S.C. §362(h).

In this case, not only did the Defendants fail to seek modification of the automatic stay

59

before dissolving the NAB, LLC, but the Debtor's theory of the case contains more than a whiff of an allegation of bad faith conduct. Given the initial filing of a motion for relief from automatic stay by the Defendants, the Debtor suggests that the dissolution of the LLC was an attempted "end-run" around §362(a)(3). This theory gains strength based on consideration of the prompt reconstitution of the minor league just weeks after the dissolution of the NAB, LLC. What business rationale existed for dissolution of the league and the almost immediate creation of a new league without the Debtor? Could it have been an effort by the Team Members to control the value of the Debtor's membership interest?[76] Or, were there perfectly innocent reasons for these actions? Had the Defendants filed a §362(d) motion, all of these issues could have been explored without exposing the Defendants to the potential liability asserted in this adversary proceeding.[77]

In reaching the conclusion that Count I of the Second Amended Complaint remains viable based on the effect that the dissolution of the LLC had on the Debtor's membership interest, I am aware of the principle espoused by a considerable number of courts that §362(a)(3) "does not bar every proceeding hostile to a debtor's claimed interest in property." In re Gyncor, Inc., 251 B.R. at 355. I can certainly envision a situation where an LLC, such as NAB, LLC, would have a rational business reason for dissolving, with the necessary consequence that a bankruptcy debtor's interest in the entity would be substantially diminished or eviscerated. However, dissolution is not the

---

[76] By acting as they did, the Team Defendants may have created the potential to charge a fee to a new member wishing to field a team in the league in place of the Debtor's team. Presumably, that fee would be shared by the Team Defendants. By comparison, if the Debtor is able to assume and assign its membership interest in the LLC in this bankruptcy case, the value of the franchise would be received by the bankruptcy estate, not the Team Defendants.

[77] If there was an economic rationale behind the Defendants' conduct, the violation of the stay may have caused only modest damages. See 11 U.S.C. §362(h) (providing for "actual damages").

type of ongoing, ordinary course of business activity that falls outside the boundary lines of

§362(a)(3), particularly when its consequences may be devastating to the bankruptcy estate of an

entity with an ownership interest in the business.[78]  If such action has a rational basis, that is

precisely the type of "cause" that would justify a modification of the stay under 11 U.S.C. §362(d)

and one can expect that a bankruptcy court's scope of review of the business justification offered

would be circumscribed appropriately.

In conclusion, on the present record, I will permit the Debtor to proceed on the theory that

the Defendants acted to obtain possession or control of the Debtor's membership interest in the

NAB, LLC by dissolving the LLC and forming shortly thereafter the Canadian American League.[79]

Count I states a claim for violation of §362(a)(3) that is cognizable under §362(h) and the

Defendants are not entitled to summary judgment.[80]

---

[78]  Thus, if, as I have suggested, there is a balancing test between the interests of the
bankruptcy estate and the interests of other parties in proceeding normally in their postpetition
ordinary course commercial activities, in order to determine the boundaries of 11 U.S.C.
§362(a)(3), the present record in this case does not permit a finding that balance tips in favor of
the Defendants.

[79]  See also In re McCabe, 345 B.R. 1 (Bankr. D. Mass. 2006) (defendant's motion for
summary judgment denied on debtor's claim that unilateral, postpetition amendment of LLC
agreement to reduce the debtor's interest in the entity violated 11 U.S.C. §§362(a)(3)-(6)).

[80]  I acknowledge that it may have been possible to deny the Motion as to Count I based
solely on the effect of the Defendants' conduct on the Debtor's economic rights in the NAB, LLC
and  without having engaged in an analysis regarding the enforceability of the *ipso facto*
provision with respect to the Debtor's membership in the LLC. Had I decided the Motion on such
a narrow ground, great uncertainty would have remained concerning the issue that is likely the
central issue in the case. I chose to discuss the *ipso facto* issue in this Opinion in order to help
frame for the parties  the issues that still require resolution and hopefully, advance the progress of
this sluggish proceeding.  Had I not done so, I fully expect that the *ipso facto* issue would have
presented itself in the near future, most likely in the form of a disputes concerning the scope of
discovery. In addressing the *ipso facto* issue now, it provides an independent ground for denial of
the Motion.

61

## VI. <u>COUNT II - BREACH OF FIDUCIARY DUTY</u>

In Count II, the Debtor asserts that the Defendant Wolff owed a fiduciary duty to the

Debtor and breached that duty by: (1) failing to permit the Debtor's team to go dark for the 2003

or 2004 seasons while allowing other franchises to do so and (2) failing to assist the Debtor in

obtaining a purchaser for the team and discouraging potential buyers from purchasing the team

while assisting other teams in selling their franchises.[81]

Defendant Wolff seeks dismissal of Count II on the ground that as a matter of law, he

owed no fiduciary duty to the Debtor.  In support of this argument, he relies on N.C.G.S.A. §57C-

3-22(b), which states:

> <u>A manager shall discharge his duties as manager in good faith, with the care an
> ordinary prudent person in a like position</u> would exercise under similar circumstances,
> and in the manner the manager reasonably believes to be <u>in the best interests of the
> limited liability company</u>.  (emphasis added).

Defendant Wolff also points to  N.C.G.S.A. §57C-3-22(e), which states:

> Except as otherwise provided in the articles of organization or a written operating
> agreement, <u>every manager must account to the limited liability</u> company and hold as
> trustee for it any profit or benefit derived without the informed consent of the members
> by the manager from any transaction connected with the formation, conduct, or
> liquidation of the limited liability company or from any personal use by the manager of
> its property. (emphasis added).

Section 3.5 of the Operating Agreement provides:

> No Member of the Company shall be liable to the Company for monetary damages for
> an act or omission in such Member's capacity as a Manager, except as provided in the

---

[81] By referring to a purchase or sale of a " team" or "franchise," I understand the Debtor
to be referring to a purchase or sale of a membership interest in the NAB, LLC.

> Act for (I) acts or omissions which a Member knew at the time of the acts or omissions
> were clearly in conflict with the interests of the Company; (ii) any transaction from
> which a Member derived an impersonal benefit  .  .  .  .

Simply put, based on this authority, Defendant Wolff argues that in his actions as Manager of the NAB, LLC, his legal duty was to act in good faith and in the best interests of the LLC and that he owed no fiduciary duty to the Debtor as an individual member of the LLC.  More specifically, he contends that he owed no duty to the Debtor, fiduciary or otherwise, to permit the Debtor to "go dark" or assist in the sale of the franchise.  Analogizing the role of an LLC manager to that of a corporate director, Defendant Wolff cites a number of cases in support of the proposition that an individual shareholder does not ordinarily have standing to bring a direct claim for breach of fiduciary duty against a corporate officer or director, such breaches being remediable only  through shareholder derivative actions.  E.g., In re Insulfoams, Inc., 184 B.R.  694, 703 (Bankr. W.D. Pa. 1995), aff'd, 104 F.3d 547 (3d Cir. 1997).  But see RSN Properties v. Jones, 168 N.C. 729, 609 S.E.2d 498 (2005) (remanding for further factfinding on claim by one LLC member against another for breach of duty to account to the LLC).

Defendant's Wolff position is not unreasonable.  Indeed, further support for the principle that a manager of a North Carolina LLC owes no fiduciary duty to an individual member can be derived by comparing the North Carolina statute to other state statutes governing LLC's.  Some state statutes explicitly provide that the manager of an LLC owes a duty of loyalty or a fiduciary duty to both the entity and its individual members.  See Moll, 40 Wake Forest L. Rev. at 965 & n.262 (collecting and citing several state statutes and case law).  The NCLLCA lacks such a provision.

63

Nevertheless, I conclude that the courts in North Carolina would hold that a manager of an LLC owes a duty to the individual members of the LLC that may be the subject of a claim for breach of fiduciary duty.[82]  I draw this conclusion from the well established principle under North Carolina law that majority shareholders owe a fiduciary duty to minority shareholders in a corporation.  The Farndale Company, LLC v. Gibellini, 628 S.E. 2d 15, 19 (N.C. App. 2005); Freese v. Smith, 110 N.C. App. 28, 38, 428 S.E. 2d 841, 848 (1993); see also Loy v. Lorm Corp., 52 N.C. App. 428, 433, 278 S.E. 2d 897, 901 (1981) ("once a minority shareholder challenges the fairness of the actions taken by the majority, the burden shifts to the majority to establish that its actions were in all respects inherently fair to the minority and undertaken in good faith").   While my research has uncovered no controlling precedent,[83] I predict that the North Carolina appellate courts would extend to LLC's the principles developed in the law of closely-held corporations that are designed to protect minority shareholders.  See generally Moll, 40 Wake Forest L. Rev. at 920-62 (discussion of similarities between closely-held corporation and LLC's).

---

[82]  In the context of a business governance dispute, one court explained the essence of a breach of fiduciary duty claim as follows:

> A claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care. Id. In order to recover, one must show the existence of a duty on the part of the alleged wrongdoer not to subject such person to the injury complained of, a failure to observe such duty, and an injury proximately resulting therefrom.

McConnell v. Hunt Sports Enters., 132 Ohio App.3d 657, 687, 725 N.E.2d 1193, 1215 (1999); accord, Carlisle v. Keith, 169 N.C. App. 674, 682, 614 S.E. 2d 542, 548 (2005) ("[b]reach of fiduciary duty is a species of negligence or professional malpractice).

[83]  In Haynes v. B&B Realty Group, LLC, 633 S.E.2d 691 (N.C. App. 2006), the plaintiff asserted a claim for breach of fiduciary duty against the controlling member of an LLC in which the plaintiff claimed an interest.  The court did not decide the viability of the claim, instead finding that the plaintiff was not, in fact, a member of the LLC.  Id. at 695.

Since the majority members of an LLC have a duty to its minority members and Defendant

Wolff's authority as manager of the NAB, LLC is derived entirely from the exercise of powers

delegated by the "member-managers" of the LLC,[84] it follows, and I find, that Defendant Wolff,

too, owed a duty to the LLC's individual members, including the Debtor.

While I can envision a number of perfectly reasonable explanations that would justify

Defendant Wolff's business judgment in failing to assist the Debtor in the manner alleged in the

Complaint, I am once again unprepared to rule on the issue given the present state of the record.

The Debtor may have a difficult time proving that Defendant Wolff breached his duty, but in

making all reasonable inferences in favor of the Debtor and consistent with the theory underlying

the Debtor's claim under §362, both Defendant Wolff in his capacity as a member and the other

Team Members possibly stood to profit from conduct which would cause the Debtor to forfeit its

membership in the NAB, LLC.  Thus, I perceive at least the possibility that the challenged conduct

was part of pattern designed to "oppress" the Debtor and devalue its membership interest.  I

conclude that the Debtor is entitled to obtain discovery and pursue this theory.

---

[84]  See Operating Agreement §3.1 (providing that each member is also a manager of the
NAB, LLC and authorizing election of assistant managers with duties designated by the
members); id. §3.2 (appointing Defendant Wolff as "President" with responsibility for "day-to-
day management" of the LLC and "all powers necessary and convenient to carry out such
management responsibilities").

## VII.  <u>CONCLUSION</u>

For the reasons set forth above, I will enter an order denying the Defendants' Motion to
Dismiss the Debtor's Second Amended Complaint and direct the Defendants to file an Answer to
the complaint within twenty (20) days.  I will also schedule a status conference to obtain input
from the parties in devising an appropriate pretrial schedule in this case.

Date:    **February 5, 2007**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

66

## UNITED STATES BANKRUPTCY COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| **ALLENTOWN AMBASSADORS, INC.,** | : | |
| | : | Bky. No. 04-22368ELF |
| **Debtor** | : | |
| | : | |
| | : | |
| **ALLENTOWN AMBASSADORS, INC.** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **NORTHEAST AMERICAN BASEBALL, LLC,** | : | |
| **et al.** | : | |
| | : | |
| **Defendants** | : | Adv. No. 04-2390 |

# O R D E R

**AND NOW,** for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that:

1. The Defendants' Motion to Dismiss the Debtor's Second Amended Complaint is **DENIED**.

2. The Defendants shall file an Answer to the Complaint within twenty (20) days from the entry of this Order.

3. A pretrial conference is scheduled for **March 1, 2007, at 1:00 p.m.** in Bankruptcy Courtroom No. 1, U.S. Courthouse, 900 Market Street, 2d Floor, Philadelphia, PA 19107. Counsel may appear telephonically, at their option. See L.B.R. 9076, as amended effective December 13, 2006.

Date:   **February 5, 2007**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**